ANGELO SANZARI, ADMINISTRATOR *AD PROSEQUENDUM* AND GENERAL ADMINISTRATOR OF THE ESTATE OF VIOLET SANZARI, DECEASED, AND ANGELO SANZARI, INDIVIDUALLY, PLAINTIFF-APPELLANT, v. PHILIP J. ROSENFELD AND LAWRENCE I. SHEPHARD, DEFENDANTS-RESPONDENTS.

Argued December 19 and 20, 1960—Decided January 23, 1961.

130

*Mr. Seymour Cohen* argued the cause for the plaintiff-appellant (*Mr. Joseph Coult* of counsel and on the brief).

*Mr. Kevin M. O'Halloran* argued the cause for the defendants-respondents (*Messrs. Morrison, Lloyd & Griggs,* attorneys, *Mr. Kevin M. O'Halloran* on the brief).

The opinion of the court was delivered by

PROCTOR, J. This is a death action involving a claim of dental malpractice. The specific act of negligence stressed

at the trial by the plaintiff, administrator *ad pros* and general administrator of the estate of Violet Sanzari, was that the defendant, Dr. Philip J. Rosenfeld, failed either to take a medical history or an adequate history from Mrs. Sanzari before administering anesthesia. The trial court granted defendants' motion for dismissal at the end of plaintiff's case. We certified plaintiff's appeal before hearing in the Appellate Division.

█ When ruling upon a motion for judgment of dismissal, the court must view plaintiff's evidence as true, and draw therefrom every legitimate inference of fact favorable to the plaintiff. Applying that standard to the present case, we find that the evidence discloses the following:

The defendants, Drs. Rosenfeld and Shepard, were partners in the practice of dentistry at Hackensack, Bergen County. On August 27, 1958 Mrs. Sanzari visited Dr. Rosenfeld (hereinafter called defendant) to have a filling replaced. After the defendant injected an anesthetic solution into Mrs. Sanzari's gums, she asked him to wait a few minutes because she was "very nervous." He waited three to five minutes, began work, and completed filling the tooth in about twenty minutes. Mrs. Sanzari then rose from the chair, prepared to leave the room, and fell, having suffered a cerebral hemorrhage or stroke, as a result of which she died three days later.

The anesthetic solution injected into Mrs. Sanzari's gums was Xylocaine in combination with Epinephrine, a compound manufactured by Astra Pharmaceutical Products, Inc. A brochure prepared by the manufacturer and accompanying each container of Xylocaine describes the nature of the solution and states that it is prepared in three ways: with two strengths of Epinephrine and without Epinephrine. The brochure further states that Xylocaine without Epinephrine is "adequate in those cases where vasopressor drugs are contraindicated." Xylocaine is an anesthetic. Epinephrine is a vasoconstricting drug, *i. e.,* one which compresses the diameter of the blood vessels. It is administered in com-

bination with Xylocaine to contain the latter in the injected area so as to extend the duration of the anesthetic effect. A consequence of administering Epinephrine is to increase the patient's blood pressure. It is for this reason that the use of Epinephrine is contraindicated in cases where the patient suffers from hypertension (high blood pressure). In a hypertensive patient the bursting point of the blood vessels is reached very quickly upon elevation of the blood pressure. Only a minute amount of Epinephrine is required to raise the pressure. A stroke is the cerebral hemorrhage which results from the bursting of the vessels.

Mrs. Sanzari suffered from high blood pressure. From June 16, 1947 to November 2, 1956, she was treated by her physician, Dr. Arthur Greenfield, for high blood pressure, an old systolic heart murmer, chronic myocarditis and over-weight. She first visited the defendant for dental work on June 25, 1956, when she was still being actively treated by Dr. Greenfield. Medical testimony showed that the Epine-phrine-bearing compound injected by defendant aggravated Mrs. Sanzari's already hypertensive condition, causing the cerebral hemorrhage and ensuing death.

The foregoing is a resume of what a jury could find on the basis of the testimony presented.

There was also testimony that at the time the defendant injected the Xylocaine with Epinephrine into Mrs. Sanzari, he was unaware that she suffered from hypertension. His dental records contain no mention of any medical history. However, in his deposition, admitted in evidence, he stated that it was his practice to ask all patients upon the occasion of their first visit how their "general health" was. Only if the patient told him of some condition would he make any notation upon his chart. He said that to the best of his recollection, it was his "guess" that he asked Mrs. Sanzari how her general health was, and that since he made no notation on his chart, she must not have told him anything about her hypertension. If he had known Mrs. Sanzari was hypertensive, he would have consulted her physician before

administering the solution. On the other hand, he also stated that to his knowledge Xylocaine with Epinephrine was not contraindicated in cases of patients suffering from hypertension.

The trial court granted defendants' motion for dismissal at the close of plaintiff's case on the grounds that (1) there was no expert testimony as to the method of treatment approved by dentists administering anesthesia, and (2) there was no evidence that defendant failed to obtain a history from the patient. Plaintiff urges reversal of the judgment below on the grounds that (1) if he did not establish the applicable standard of care, it was because the trial court erroneously prohibited his expert from testifying thereto, (2) he in fact did establish a standard of care, and (3) it was unnecessary to establish a standard of care in this case.

I.

*Was plaintiff's expert qualified to testify to the applicable standard of care?*

■■ Negligence is conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm. In the usual negligence case, it is not necessary for the plaintiff to prove the standard of conduct violated by the defendant. It is sufficient for plaintiff to show what the defendant did and what the circumstances were. The applicable standard of conduct is then supplied by the jury which is competent to determine what precautions a reasonably prudent man in the position of the defendant would have taken. 2 *Harper & James, Torts,* § 17.1, *pp.* 963–964 (1956). "[T]he jury [thus] must formulate an unformulated community standard of conduct and match the defendant's acts against it." Morris, "The Relation of Criminal Statutes to Tort Liability," 46 *Harv. L. Rev.* 453, 454 (1933). In the ordinary dental or medical malpractice case, however, the jury is not competent to supply the standard by which to measure the de-

fendant's conduct. Since it has not the technical training necessary to determine the applicable standard of care, it cannot, without more, form a valid judgment as to whether the defendant's conduct was unreasonable under the circumstances. Therefore, ordinarily when a physician or dentist is charged with negligence in the treatment of a patient, the standard of practice to which he failed to adhere must be established by expert testimony. In such cases, if the plaintiff does not advance expert testimony establishing an accepted standard of care, it is proper for the court to grant a dismissal at the close of plaintiff's case. *Hull v. Plume,* 131 *N. J. L.* 511 (*E. & A.* 1944); *Burdge v. Errickson,* 132 *N. J. L.* 377 (*E. & A.* 1945); *Toy v. Rickert,* 53 *N. J. Super.* 27 (*App. Div.* 1958). See *Carbone v. Warburton,* 11 *N. J.* 418 (1953); 7 *Wigmore, Evidence* § 2090a, *p.* 453 (*3d ed.* 1940); *Rogers, Expert Testimony* § 153, *p.* 361 (*3d ed.* 1941).

Plaintiff's expert witness was a physician, Dr. Isaac M. Kaplan. After testifying as to his medical and dental anesthesiological experience, the nature and function of Xylocaine and Epinephrine, and the effect of Epinephrine on a hypertensive person, Dr. Kaplan was asked the following questions:

■ "Q. Doctor, are you familiar with the general accepted practice among dentists in this area, the Bergen County area, with reference to the use of anesthetics in dental cases?

■ Q. Doctor, in your experience as an anesthesiologist, both in the medical and dental anesthesiology fields, is it proper practice for either the dentist or the doctor prior to administering an anesthesia to take a history from a patient?

■ Q. Doctor, do you know from your own knowledge and experience what standard of care is used by dentists in the Bergen County area with reference to the use of anesthetics?"

The trial court did not permit Dr. Kaplan to answer the above-quoted questions because, in its view, since he was not a dentist, he was not qualified to testify to the proper standard of care applicable to the dental profession.

■ In this State, a trial judge's determination of whether a witness is qualified to testify as an expert may be reviewed, and, if clearly erroneous, may be set aside. See *Bosze v. Metropolitan Life Insurance Co.,* 1 *N. J.* 5 (1948) ; *Rempfer v. Deerfield Packing Corp.,* 4 *N. J.* 135 (1950).

■ The test of whether a particular witness is competent to testify as an expert in a malpractice action is whether he has sufficient knowledge of professional standards applicable to the situation under investigation to justify his expression of an opinion relative thereto. *Carbone v. Warburton, supra,* 11 *N. J.,* at *p.* 425. It is generally held that the witness must be a licensed member of the profession whose standards he professes to know. See, *e. g., Hull v. Plume, supra,* 113 *N. J. L.,* at *p.* 515; *Rawleigh v. Donoho,* 238 *Ky.* 480, 38 *S. W. 2d* 227 *(Ct. App.* 1931). The reason for this requirement is that when the subject matter testified to falls distinctly within the province of a particular profession, the license to practice imports the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion. But some facets of professional practice fall within the province of more than one profession. Medicine and dentistry overlap, for example, in the fields of diseases of the mouth, oral surgery, and the administration of anesthesia. See *N. J. S. A.* 45:6–19, 3d par., (1) (permitting physicians to treat diseases of the mouth and perform oral surgery) ; *N. J. S. A.* 45:6–19, 1st par., (7) (making the administration of local or general anesthetics in conjunction with a dental operation the practice of dentistry). The above-cited statutory provisions indicate that there is a degree of mutual competence in some areas of medical and dental practice—of significance to the present case, specifically in the field of dental anesthesia.

■ It seems to us that in these areas where the medical and dental professions overlap, a physician familiar with the situation in issue is competent to testify to the accepted practice among dentists. Indeed, at least two courts have so held. *Hazelwood v. Adams,* 245 *N. C.* 398, 95 *S. E. 2d*

917 (*Sup. Ct.* 1957); *Burch v. Greenwald,* 247 *App. Div.* 471, 286 *N. Y. S.* 661 (*App. Div.* 1936). *Cf. Dolan v. O'Rourke,* 56 *N. D.* 416, 217 *N. W.* 666 (*Sup. Ct.* 1928); *Hundley v. St. Francis Hospital,* 161 *Cal. App.* 2d 800, 327 *P.* 2d 131 (*D. Ct. App.* 1953). It may be that the mere fact that one is a licensed physician may not alone qualify him to express an opinion as to approved methods of anesthetic treatment by dentists. But the license to practice medicine does indicate that the holder has sufficient knowledge to understand and evaluate methods of dental anesthetic treatment that he may become acquainted with through specific study and experience. We have held that an expert in a malpractice action need not have had personal experience with the situation under investigation to testify to the applicable standard of care. His knowledge may derive from observations of the methods used by members of the profession or from his study of professional treatises and journals. *Carbone v. Warburton, supra,* 11 *N. J.,* at *p.* 425. That being so, we think plaintiff adequately demonstrated Dr. Kaplan's competency to testify as an expert witness.

Upon direct and cross-examination of Dr. Kaplan, the following picture of his professional background emerged: He is a licensed physician and surgeon of the State of New Jersey, maintaining his office in Teaneck, Bergen County, and a founding member of the New Jersey State Society of Anesthesiologists. From about 1941 to 1954, he specialized in dental anesthesiology. After 1954, he engaged in the general practice of medicine but continued an active practice in dental anesthesiology. In his capacity as a dental anesthesiologist, he administers anesthetics in dental operations, and consults with dentists about their administration of anesthesia. Among other things, he examines dental patients and advises dentists as to what particular anesthetic is most suitable for a particular patient. He is familiar with Xylocaine and Epinephrine; and he has administered Xylocaine with or without Epinephrine not less than five hundred times in ten years, but never in a dental case. It is his

practice to leave the administration of local anesthetics to the dentist. He has never attended dental school, holds no dental degree, and is unfamiliar with the courses in anesthesiology offered by dental schools. He stated, however, that he was familiar with the practical training a dentist receives in the use of anesthesia, having personally exhibited before the New Jersey Dental Society on the subject.

We think that the above-outlined evidence shows that Dr. Kaplan was qualified to testify as to the applicable standard of care in the present case. The facts that he is not a licensed dentist, did not attend dental school, and is unfamiliar with the curriculum pertaining to anesthesiology in the ordinary dental school, go to the weight to be accorded his opinion and not to his competency to testify. His training and experience show sufficient qualifications to allow him to state his opinion, leaving to the jury the determination of its worth. *Carbone v. Warburton, supra,* 11 *N. J.,* at *p.* 426; *Young v. Stevens,* 132 *N. J. L.* 124, 126 (*E. & A.* 1944). Accordingly, we hold that Dr. Kaplan was competent to testify and that the trial court mistakenly exercised its discretion by refusing to allow him to answer the questions pertaining to the proper standard of care to be used by dentists administering anesthesia.

## II.

### *Did plaintiff in fact establish a standard of care without testimony by his expert?*

Plaintiff also urges reversal of the judgment below on the ground that the brochure accompanying each container of Xylocaine, and admitted in evidence, was proof of the applicable standard of care among dentists. In support of his argument, plaintiff cites *Julien v. Barker,* 75 *Idaho* 413, 272 *P. 2d* 718 (*Sup. Ct.* 1954) ; *Salgo v. Leland Stanford, Jr., University Bd. of Trustees,* 154 *Cal. App. 2d* 560, 317 *P. 2d* 170 (*D. Ct. App.* 1957) ; *Marchese v. Monaco,* 52 *N. J. Super.* 474 (*App. Div.* 1958), certification denied 28 *N. J.*

565 (1959). These cases are distinguishable from the present case. In *Marchese* the defendant conceded that the brochure was properly admitted in evidence but argued that a manufacturer's brochure alone cannot establish the standard of care in the use of a drug. The Appellate Division found it unnecessary to decide the question because there was other evidence in the case as to the applicable standard of care. In *Julien* and *Salgo* the manufacturers' brochures were admitted as *prima facie* proof of the standard of care, but those brochures contained descriptions of the proper method of using the drug from which method defendants were alleged to have departed. In the present case, the standard from which defendant is alleged to have departed is the taking of a medical history or adequate medical history before administering anesthesia. The brochure accompanying Xylocaine says nothing about taking a history from the patient. It merely states that Epinephrine constricts the blood vessels and that where such constriction is contraindicated Xylocaine without Epinephrine may be administered. The jury could not find *from these statements in the brochure alone* that proper practice among dentists required the taking of a history before injecting Xylocaine with Epinephrine into a patient. The brochure was therefore not evidential of the standard of care demanded of the defendant. In light of the above, it is unnecessary for us to determine whether a manufacturer's brochure, alone or in conjunction with other evidence, is admissible as proof of the standard of care in the administration of a drug.

If the brochure is inadmissible as proving a standard of care, is it admissible for any other purpose? Defendant denies that it is, and cites the rule in New Jersey that a technical treatise is inadmissible as evidence of the truth of statements contained therein. It has been stated that the reason for exclusion is that such evidence falls within the ban of the hearsay rule as statements made out of court by a person not subject to cross-examination. *Kingsley v. Delaware, L. & W. R. R. Co.*, 81 *N. J. L.* 536 (*E. & A.*

1911); *New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N. J. L.* 189 (*E. & A.* 1896); see *Ruth v. Fenchel, 21 N. J.* 171, 176 (1956). Defendant argues that if a medical treatise does not constitute substantive evidence of statements contained therein, *a fortiori,* a drug manufacturer's brochure does not. But the defendant's argument is irrelevant to the admissibility of the brochure in the present case. The defendant stated that he had read the brochure at least when he first started using Xylocaine. And even if he had not read it, the jury could reasonably conclude that under the circumstances he should have read it. It is therefore admissible as indicating that he was or should have been alerted to the possible dangers in the use of Xylocaine with Epinephrine. In other words, the brochure is evidence of the fact that Dr. Rosenfeld was on notice Epinephrine might be harmful to hypertensive patients.

### III.

#### *Was it necessary for plaintiff to prove a standard of care?*

Plaintiff next argues that either *res ipsa loquitur* or the doctrine of common knowledge applies to the facts of this case and that, therefore, he did not have to prove a standard of care to avoid a dismissal.

The doctrine of *res ipsa loquitur* applies when it is reasonable to say that, under the circumstances, the injury to the plaintiff would not have occurred in the absence of the defendant's negligence. *Prosser, Torts* § 42, *p.* 201 (1955); Annotation 162 *A. L. R.* 1265 (1946) (collecting cases). Whether the *res ipsa* doctrine applies to a given case therefore depends upon the probabilities. Where, for example, a surgical sponge is left inside a patient after an operation, it is reasonable to say the probability is that someone has been negligent. *E. g., Funk v. Bonham,* 204 *Ind.* 170, 183 *N. E.* 312 (*Sup. Ct.* 1932); *Ault v. Hall,* 119 *Ohio St.* 422, 164 *N. E.* 518, 60 *A. L. R.* 128 (*Sup. Ct.* 1928).

The plaintiff, therefore, is permitted to establish a *prima facie* case of negligence by proof of his injury and the surrounding circumstances; he does not have to prove a specific act or omission by the defendant or an applicable standard of care. The procedural effect of applying the doctrine is to permit the jury to infer negligence so at least to avoid a dismissal at the end of plaintiff's case. See *Bornstein v. Metropolitan Bottling Co.*, 26 N. J. 263, 269 (1958); *Kahalili v. Rosecliff Realty, Inc.*, 26 N. J. 595, at *pp.* 605, 606 (1958). Plaintiff argues that *res ipsa* is applicable to the present case. He asserts, "In the absence of negligence the routine filling of a tooth does not result in death." We think that this is too broad a contention. It would make every untoward result of a dental or medical operation or treatment a *res ipsa* case. There are a variety of reasons why a patient may die while being operated on by a dentist —none of which may be related to the dentist's failure to exercise proper skill and care. While there is proof in the present case that Mrs. Sanzari died from the injection, that fact does not of itself evidence negligence. In other words, the probabilities are such that one cannot reasonably say that in the absence of negligence a patient would not die in the dentist's chair. Since the fundamental postulate of the *res ipsa* doctrine cannot be assumed upon the facts in the present case, application of the doctrine is inappropriate.

The doctrine of "common knowledge" is related to *res ipsa loquitur,* but there is a distinction between the two. In *res ipsa* cases, plaintiff need only prove his injury, and need not prove a standard of care or a specific act or omission. Ordinarily, the common knowledge doctrine is applied in a malpractice case after the plaintiff proves his injury and a causally related act or omission by the defendant. The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto. In other words, application of the doctrine transforms the case into an ordinary negligence case where, as mentioned above,

the jury, from its fund of common knowledge, assays the feasibility of possible precautions which the defendant might have taken to avoid injury to the plaintiff. The basic postulate for application of the doctrine therefore is that the issue of negligence is not related to technical matters peculiarly within the knowledge of medical or dental practitioners. See *Louisell & Williams, Trial of Medical Malpractice Cases*, § 8.04, *p.* 205, § 8.05, *p.* 206 (1960): For example, in *Steinke v. Bell*, 32 *N. J. Super.* 67 (*App. Div.* 1954), the plaintiff proved that defendant-dentist mistakenly removed one of her teeth. Defendant argued that plaintiff could not recover unless she offered testimony establishing what professional standards were demanded of him in such a situation. The Appellate Division held that the jury was competent to determine the applicable standard of care. It said:

"We think laymen, looking at this case in the light of their common knowledge and experience, can say that a dentist engaged to remove a lower left second molar is not acting with the care and skill normal to the average member of the profession if, in so doing, he extracts or causes to come out an upper right lateral incisor. Expert testimony was therefore not necessary under the circumstances of this case." *Id.*, 32 *N. J. Super.*, at *p.* 70.

Similarly, in *Becker v. Eisenstodt*, 60 *N. J. Super.* 240 (*App. Div.* 1960), plaintiff proved defendant-doctor must have inserted a caustic solution in her nose. The Appellate Division held that expert testimony as to standard of care in such situations is not necessary. It said, "[I]t is the type of negligence which lay jurors can appreciate without the testimony of medical experts to describe the applicable standard of care." *Id.*, 60 *N. J. Super.*, at *p.* 246. See also *Terhune v. Margaret Hague Maternity Hospital*, 63 *N. J. Super.* 106, 115 (*App. Div.* 1960).

Plaintiff argues that the jury in the present case could properly have made a determination based upon their common knowledge that defendant was negligent. There was proof in the case that Epinephrine is a form of adrenalin.

The plaintiff argues that "Laymen know that adrenalin is a drug with a powerful effect on the heart and the blood circulation," and that before administering such a drug a dentist should take a detailed medical history from the patient. We do not agree. The nature of adrenalin, its effect upon a patient, and what a dentist does or should do before injecting it in combination with a local anesthetic are matters of technical knowledge which we believe to be beyond the ken of the average layman. But it does not follow that because the jury does not have common knowledge of the approved method of dental treatment before administering anesthesia that expert testimony is essential for this plaintiff to avoid a dismissal at the end of his case.

 We believe that the doctrine of common knowledge combined with the manufacturer's brochure admitted in evidence was sufficient to avoid a dismissal, especially in the light of defendant's testimony that he was unaware that the drug was contraindicated for patients suffering from hypertension. The brochure stated that Epinephrine is administered with Xylocaine to prolong the anesthetic effect of the latter drug; that to achieve greater constriction of the blood vessels (haemostasis) the concentration of Epinephrine should be increased; and that in cases where vasopressor drugs (Epinephrine) are contraindicated (dangerous) Xylocaine can be used alone. From this evidence the jury could reasonably conclude that defendant knew or should have known that it was dangerous to administer Epinephrine to a hypertensive patient. We believe that it is within the common knowledge of laymen that a reasonable man, including a dentist, who knows a drug is potentially harmful to a certain type of patient should take adequate precaution before administering the drug or deciding whether to administer it. The jury could reasonably conclude from the evidence that defendant took no precautions or inadequate precautions before injecting Xylocaine with Epinephrine into Mrs. Sanzari. Defendant said it was his "guess" that he asked her how her general health was. But his chart con-

tained no notations at all about her condition. His lack of assurance about what he did, plus the absence of any record would support a legitimate inference that he did nothing. See *Ferdinand v. Agricultural Ins. Co. of Watertown, New York,* 22 *N. J.* 482, 494 (1956).

The judgment below is reversed and the case is remanded because (1) the trial court erroneously refused to allow the plaintiff's expert to testify to the standard of care accepted by dentists administering anesthesia, and (2) even in the absence of expert testimony as to standard of care, the plaintiff submitted sufficient proof to avoid a dismissal at the end of his case.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

*For affirmance*—None.