111 N.J. Super. 283 (1970)
268 A.2d 292
LUCILLE B. JONES, PLAINTIFF-APPELLANT,
v.
LEO STESS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 22, 1970.
Decided July 27, 1970.
*284 Before Judges KILKENNY, LABRECQUE and LEONARD.
Mr. Kenneth E. Joel argued the cause for plaintiff-appellant.
Mr. Richard A. Amdur argued the cause for defendant-respondent (Messrs. Hanlon, Argeris & Amdur, attorneys).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Plaintiff Lucille B. Jones appeals from a judgment in favor of defendant Leo Stess following the granting of defendant's motion for involuntary dismissal at the close of her case.
On September 12, 1966 plaintiff visited the office of defendant, a licensed chiropodist (podiatrist), for the purpose of having her "feet, her nails and her calluses taken care *285 of." Defendant had been treating her for a number of years and knew that she suffered from diabetes. In a portion of his deposition which was offered in evidence he stated that he had specifically noted that fact on his office record card, by underlining the word "diabetic" in red ink. He gave as the reason for this the fact that "diabetic patients are special patients to be considered with care"  they "have to be watched more closely," "as a precaution against infection or injury." He added, "we don't work too close with diabetic patients" and agreed that "you don't want to unintentionally cut a diabetic."
On the day in question, after soaking plaintiff's feet in a whirlpool bath, defendant began clipping her toe nails. When he reached the great toe of her left foot he, in some manner, clipped the inside of her toe. When she jerked her foot back because it hurt, he allegedly said, "I'm sorry, Mrs. Jones, but those kids have upset me. They have been in here all afternoon * * *," (she had previously heard two boys talking and "kidding around" with the doctor). She felt pain in the toe but after he had applied a red substance to it she was permitted to return home.
By the next day the pain was worse. Two days later continued pain in the toe caused her to consult Dr. Wales, her personal physician. When she did not respond to his treatment he referred her to Dr. Slobodien, a surgeon, who observed an area of infection on the inside of the left big toe. Subsequent x-rays indicated that the infection had penetrated into the bone below. Dr. Slobodien ordered plaintiff admitted to Perth Amboy General Hospital where, on October 31, 1966, her condition was diagnosed as osteomyelitis of the toe, and an operation was performed which consisted of removing the nail and curetting the osteomyelitic area of the distal phalanx. When the infection persisted plaintiff was readmitted to the hospital on December 26 at which time, because diabetic gangrene had set in, her entire toe was amputated. When the condition continued to spread she underwent three more operations, the last, an *286 amputation, extending to her mid thigh. With the final amputation the infection was contained and healing took place. Eventually, an artificial leg was fitted.
There was medical testimony from Dr. Wales as to the existence of causal relationship between the cutting of the toe by defendant and the resultant loss of plaintiff's left leg. Dr. Slobodien testified that "diabetics have problems with regard to healing, particularly with infection." As to the reasons for this he stated, "Basically, one of them is that the blood vessels are older than the individual is, and the second is that because of the fluctuating sugar levels in the body, infection itself tends to recede more slowly than it would in individuals without diabetes." He added that, "[D]iabetes affects blood vessels in the body, primarily arteries of the middle size. Because these vessels are involved, the blood flow through these vessels is diminished," and "[I]n order to have proper healing, [w]hat you want is an adequate blood flow to the area as much as possible, and in diabetics this flow is decreased." He opined that the diminished blood flow would affect the lower extremities most severely.
Dr. Wales was in substantial accord. With reference to the extremities he testified, "Great care must be used in taking care of these areas because any type of trauma can precipitate an infection in the toe."
At the close of plaintiff's case the court granted defendant's motion for an involuntary dismissal on the ground that plaintiff was required, but had failed, to adduce expert testimony as to the standard of care required of defendant, and whether there had been a deviation from that standard.
The sole question presented by the present appeal is whether the foregoing testimony was sufficient to make out a prima facie case, and thus require defendant to put in his defense.
In passing upon defendant's motion to dismiss, the court was required to consider the proofs in the light most favorable to plaintiff, and to accord her the benefit of the *287 most favorable inferences reasonably to be drawn from them. Sanzari v. Rosenfeld, 34 N.J. 128, 132 (1961). Applying that standard to the present case, we are satisfied that plaintiff's proofs presented a jury question, and that the dismissal was error.
As a chiropodist, licensed pursuant to N.J.S.A. 45:5-1 et seq., defendant was required to possess that degree of knowledge and skill usually pertaining to other members of his profession. Cf. Hull v. Plume, 131 N.J.L. 511 (E. & A. 1944). See Annotation, "Liability of Chiropodist for Malpractice," 80 A.L.R.2d 1278 (1961). In the rendition of his professional services, he was required to exercise that degree of care, knowledge, and skill ordinarily possessed and exercised in similar situations by the members of his profession. Cf. Fernandez v. Baruch, 52 N.J. 127 (1968).
In general, in a malpractice action the patient is required to establish that defendant's treatment fell below the standards established and recognized in the profession in which defendant was engaged. Ordinarily, the question of what those standards demanded of defendant, or whether he had deviated therefrom, is to be established by expert testimony. Carbone v. Warburton, 22 N.J. Super. 5 (App. Div. 1952), aff'd 11 N.J. 418 (1953); Ayers v. Parry, 192 F.2d 181 (3 Cir.1951), cert. den. 343 U.S. 980, 72 S.Ct. 1081, 96 L.Ed. 1371 (1952), reh. den. 344 U.S. 849, 73 S.Ct. 49, 97 L.Ed. 660 (1952), 344 U.S. 916, 73 S.Ct. 337, 97 L.Ed. 707 (1953), 345 U.S. 961, 73 S.Ct. 941, 97 L.Ed. 1381 (1953). However, a well recognized exception dispenses with the need for such testimony where the facts are such that it may be said, looking at it in the light of the "common knowledge and experience" of laymen, that there has been a lapse from the standard. Steinke v. Bell, 32 N.J. Super. 67, 69 (App. Div. 1954); Sanzari v. Rosenfeld, supra, 34 N.J. at 141; Martin v. Perth Amboy General Hospital, 104 N.J. Super. 335, 342 (App. Div. 1969); Becker v. Eisenstodt, 60 N.J. Super. 240, 246 (App. Div. 1960); Ayers v. Parry, supra, 192 F.2d at 184-185. See *288 also Annotations, "Necessity of Expert Evidence to Support an Action for Malpractice against a Physician or Surgeon," 141 A.L.R. 5, 12, 24, 29 (1942), 81 A.L.R.2d 597, 608, 641 (1962); "Liability of Dentist to Patient," 83 A.L.R.2d 7, 78, 89 (1962).
Becker v. Eisenstodt, supra, involved the use of a caustic solution in a patient's nose by a plastic surgeon while Steinke v. Bell, supra, involved the removal of the wrong tooth by a dentist. In Sanzari v. Rosenfeld, supra, where the patient died as a result of a cerebral hemorrhage allegedly caused by aggravation of her hypertensive condition brought about by the injection of Epinephrine, an anesthetic solution, into her gums by a dentist, Justice Proctor referred to the "common knowledge" exception as follows:
Ordinarily, the common knowledge doctrine is applied in a malpractice case after the plaintiff proves his injury and a causally related act or omission by the defendant. The effect of applying this doctrine is to allow the jury to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto. In other words, application of the doctrine transforms the case into an ordinary negligence case where, as mentioned above, the jury, from its fund of common knowledge, assays the feasibility of possible precautions which the defendant might have taken to avoid injury to the plaintiff. The basic postulate for application of the doctrine therefore is that the issue of negligence is not related to technical matters peculiarly within the knowledge of medical or dental practitioners. [34 N.J. at 141-142]
In holding, based on the manufacturer's brochure which had indicated that the drug was contraindicated for patients suffering from hypertension, that the dismissal at the end of plaintiff's case was error, he concluded, "We believe that it was within the common knowledge of laymen that a reasonable man, including a dentist, who knows a drug is potentially harmful to a certain type of patient should take adequate precaution before administering the drug or deciding whether to administer it." 34 N.J. at 143. Compare Ayers v. Parry, supra, where a claim of malpractice *289 based upon damage to nerve roots during spinal anesthesia was held to require expert testimony.
In Ayers v. Parry the court referred to Vergeldt v. Hartzell, 1 F.2d 633 (8 Cir.1924), as an example of the type of case not requiring expert testimony. In its factual pattern that case closely resembles the present one in that there the dentist's drill slipped when he momentarily turned his head toward the instrument table, whereas here the instrument slipped because the chiropodist had been upset by the boys. In Vergeldt, the Circuit Court of Appeals, in reversing the dismissal of the action by the trial judge, pointed out:
The theory of plaintiff's allegation and brief in support thereof is, not that the defendant's treatment or operation was unprofessional or below standard or that the defendant was unskillful in his work, but that the defendant was negligent and failed to observe reasonable care while performing the operation, and by reason thereof an untoward act occurred producing a positive and independent injury. [at 635]
In holding that the case was for the jury, the court quoted extensively from Evans v. Roberts, 172 Iowa 653, 660, 154 N.W. 923, 926 (Sup. Ct. 1915). In that case, while the surgeon was operating for the removal of adenoids, the instrument slipped and wounded the plaintiff. The court held:
What may be the rule where the sole question is upon the treatment of the diseased part, and whether it was in accordance with approved and medical standards, we need not here decide, for, as we have already noted, this is not a case of that kind. The jury here did not have to consider whether the method of the defendant in removing the adenoids was correct or scientific, but whether the unintentional wounding of plaintiff's tongue was occasioned by lack of reasonable care on his part. This, it would seem very clear, involves no question of science or necessarily of expert knowledge.
In the light of the proofs, we incline to the view that the present case falls within the ambit of Sanzari v. Rosenfeld, Steinke v. Bell and Vergeldt v. Hartzell. The medical testimony was adequate to sustain a finding that plaintiff suffered *290 the amputation of a substantial portion of her left leg by reason of an infection which she sustained through the breaking of her skin by defendant on the day in question. Defendant knew plaintiff was a diabetic and acknowledged the need for extra care in working on the feet of diabetics. The issue of his responsibility in tort for her condition did not depend on whether the method utilized by him was correct or scientific, but whether his unintentional wounding of her was occasioned by the lack of reasonable care on his part. Whether, inter alia, the instrument being used by him slipped because he was "upset" by the previous actions of the two boys in his office, and whether in view of his upset condition, he should have given plaintiff another appointment, or waited until his upset condition had subsided, were questions which the jury was competent to resolve without expert testimony. See also Terhune v. Margaret Hague Maternity Hospital, 63 N.J. Super. 106, 115 (App. Div. 1960); Daly v. Lininger, 87 Colo. 401, 288 P. 633 (Sup. Ct. 1930); Ambrosi v. Monks, 85 A.2d 188 (D.C. Mun. Ct. of App. 1951); Bessinger v. DeLoach, 230 S.C. 1, 94 S.E.2d 3 (Sup Ct. 1956); Gray v. Weinstein, 227 N.C. 463, 42 S.E.2d 616 (Sup. Ct. 1947). Compare Demchuk v. Bralow, 404 Pa. 100, 170 A.2d 868 (Sup. Ct. 1961) (involving injury while attempting to insert gastroscope into stomach  "an intricate surgical procedure").
Reversed and remanded for a new trial.