**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3569-17T1

JOSHUA PIPERATO, by his Parents
and Natural Guardians, CHRISTOPHER
PIPERATO and ANA PIPERATO, and
CHRISTOPHER PIPERATO, and ANA
PIPERATO, Individually,

      Plaintiffs-Appellants,

v.

ALLISON LAM, M.D., JONATHAN
GAMSS, M.D., STEPHANIE FOLTZER,
PA-C, ALEKSEY IKHELSON, PA-C,
and EMERGENCY MEDICAL
ASSOCIATES,

      Defendants,

and

ALDRIN GUERRERO, RN, JAMIE
NIGRO, RN, JOYCE IANNUZZI, RN,
NADIA PORCARO, RN, and CLARA
MAASS MEDICAL CENTER,

      Defendants-Respondents.

_____

Submitted January 30, 2019 - Decided August 23, 2019

Before Judges Accurso, Vernoia and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2081-15.

Gair Gair Conason Rubinowitz Bloom Hershenhorn Steigman & MacKauf, attorneys for appellants (Christopher J. Donadio, on the briefs).

De Cotiis Fitzpatrick Cole & Giblin LLP, attorneys for respondents (Catherine Joan Flynn, of counsel and on the brief; Stefanie L. Rokosz, on the brief).

PER CURIAM

Plaintiffs Christopher and Ana Piperato on behalf of themselves and their minor son Joshua, appeal from the entry of summary judgment dismissing their medical malpractice complaint against defendant registered nurses Aldrin Guerrero, Jamie Nigro, Joyce Iannuzzi, and Nadia Porcaro and their employer Clara Maass Medical Center and the denial of their motion for reconsideration.[1]  Because we conclude plaintiffs established a prima facie case of professional negligence on the summary judgment motion, we reverse.

Although defendants failed to file a statement of material facts in accordance with Rule 4:46-2(a), the following essential facts appear

---

[1]  Plaintiffs settled their claims against defendant doctors and physician assistants and their employer Emergency Medical Associates and those parties are not participants in this appeal.

undisputed. When Joshua was seven years old, he caught his foot in a trampoline. His father took him to an urgent care center the next day. The doctor there diagnosed Joshua with a sprained ankle.

When Joshua's pain persisted, his mother the following day took him to the emergency department at Clara Maass for treatment. Although Nurse Nadia Porcaro testified at deposition that Joshua should have received a focused assessment, she was on duty that day and did not perform one. She could not explain why. She did not examine Joshua's foot or test pulses or sensations in his foot or leg. Joshua was evaluated by a physician assistant, who ordered an x-ray that showed no fracture or dislocation. Joshua was diagnosed with a foot sprain and discharged.

As Joshua's pain persisted over the next two days, his parents took him back to the emergency department at Clara Maass two more times. When his father took him three days after his injury, the day after their first visit, he reported that Joshua had been restless and in pain the night before and had run a fever. Nurse Joyce Iannuzzi, the triage nurse, although noting Joshua presented with "foot pain — swelling," failed to assess his foot. She did not take Joshua's blood pressure, although she noted his heart rate of 160 beats a

minute was elevated. According to one of plaintiffs' experts, the normal heart rate for a seven-year-old is between 80 and 120 beats a minute.

Nurse Porcaro saw Joshua again during that visit, and again failed to examine his foot or ankle, check pulses or sensations in his leg or foot, or assess his skin temperature or color. Joshua was again evaluated by the same physician assistant, who applied a splint to Joshua's leg and provided him with crutches. Joshua was again discharged with a diagnosis of foot sprain.

That night, Joshua's mother testified Joshua was awake the entire night, crying and in a great deal of pain, not allayed by pain medication. At 3 a.m., Joshua's father took him back to the emergency department at Clara Maass. Nurse Jamie Nigro was the triage nurse on duty. Nurse Nigro took some of Joshua's vital signs but did not examine his foot, check pulses in his foot or leg, or assess his pain level. Nurse Aldrin Guerrero also examined Joshua that morning. Nurse Guerrero completed a pain assessment, recording Joshua's pain level at six on a scale of ten. Despite performing gastrointestinal, genitourinary, integumentary, neurological, and respiratory assessments, Nurse Guerrero could not recall performing, and there are no notes in the medical records indicating, a skin or sensation assessment or a pulse check of Joshua's lower leg.

A-3569-17T1

A different physician assistant examined Joshua on that visit. Performing a physical exam, she noted tenderness to the left foot, mild swelling, and ecchymosis (bruising) of the lateral and medial aspects of the left foot. The physician assistant reapplied the splint and a prescription was written for Motrin for pain as needed. Joshua was discharged around 6 a.m. with a diagnosis of foot sprain.

That morning, Joshua's mother took him with her to work. When he went to use the bathroom, she saw his leg was purple and he stopped responding to her. She called Joshua's pediatrician, who told her to take Joshua immediately to Hackensack Medical Center. On arrival at 12:30 p.m., Joshua was noted to be pale, fussy and uncomfortable. His left leg was cyanotic and cold to touch. A Doppler signal showed no pulses in his lower left extremity and an ultrasound revealed deep vein thrombosis.

Joshua was diagnosed with severe compartment syndrome and taken into surgery for a fasciotomy. Following surgery, Joshua developed septic shock and went into respiratory failure requiring ventilator support. That led to a lifesaving, below-knee amputation. When a free flap repair was unsuccessful, Joshua's leg was amputated above his knee.

A-3569-17T1

Plaintiffs served several expert reports in the course of discovery directed to the substandard care Joshua received from the nurses, physician assistants and doctors at Clara Maass responsible for his treatment. Among those reports was one rendered by a registered nurse, Jamie Byerly, that defendant nurses deviated from the accepted standards of emergency nursing practice by failing to properly assess and document findings of Joshua's complaint of lower extremity pain and swelling and failing to communicate the findings of that assessment to the physician or physician assistant.

In order to meet their burden of demonstrating those deviations harmed Joshua and contributed to the resulting amputation of his leg, plaintiffs served the report of an expert in emergency medicine, Diane Sixsmith, M.D., board certified in internal medicine and emergency medicine, who opined that "[t]he nursing assessments performed by Nurse Iannuzzi, Nurse Nigro, Nurse Porcaro, and Nurse Guerrero were deficient and incomplete and were a contributing factor to the misdiagnosis of Joshua Piperato."

In addition to providing a causation opinion with regard to the nurses, Dr. Sixsmith also rendered an opinion that defendant physician assistants deviated from the standard of care, as did defendant emergency room physicians who supervised them and co-signed their records. Dr. Sixsmith

6

A-3569-17T1

further opined that defendant Emergency Medical Associates, which employed both the physicians and the physician assistants, deviated from accepted standards by failing to ensure the proficiency of one of the physician assistants.

Plaintiffs served a report by a second expert in emergency medicine, Jill M. Baren, M.D., who concluded the physician assistants deviated significantly from the standard of care by, among other things, failing to ensure that the nursing assessments were adequately performed. Dr. Baren opined that the failure of the physician assistants and supervising physicians to ensure that each and every necessary nursing assessment was adequately completed contributed to the patient's ultimate outcome.

Plaintiffs served several other reports, directed to both deviation and causation, focused on the actions of the physician assistants and their supervising doctors. The number of reports was made necessary by what followed from Joshua's injury. As Dr. Alik Farber, plaintiff's expert vascular surgeon, explained:

> It is likely that Joshua Piperato suffered a left leg injury that likely had a crush component and developed a compartment syndrome that was not tested for and diagnosed in a timely fashion at the [Clara Maass emergency department] on multiple occasions. Additionally he likely developed an

A-3569-17T1

infection of his compromised muscle with Group A Strep that led to further and progressive tissue injury, septic shock and systemic inflammatory response syndrome. Deep venous thrombosis (DVT) likely occurred in a secondary fashion

Dr. Farber opined that had Joshua been tested "for compartment syndrome and/or infection, muscle enzymes etc., such tests would have been abnormal prompting further diagnostic workup and medical specialty consultation." In his opinion, had the appropriate testing been done, Joshua would have been correctly diagnosed on his second visit to the emergency department at Clara Maass at "a point in time where there was much less tissue affected by the compartment syndrome and/or infection."

In Dr. Farber's view, had Joshua been correctly diagnosed on that second visit, the deep vein thrombosis likely would not have occurred and amputation would have been avoided. Noting the dramatic change in Joshua's leg in the hours between his leaving Clara Maass the last time and his appearance at Hackensack Medical Center, Dr. Farber further opined that a correct diagnosis, even as late as Joshua's last visit to Clara Maass, would have likely saved his leg.

To specifically address the contribution of the infection Joshua suffered to the loss of his leg, plaintiffs served an expert report by an internist and

A-3569-17T1

specialist in infectious diseases, Angelo Scotti, M.D., who opined that had Joshua's compartment syndrome been diagnosed and treated in a timely fashion, the deep vein thrombosis and secondary infection that led to the amputation would have been avoided. He further opined that even without a compartment syndrome diagnosis, it is likely appropriate laboratory testing would have yielded abnormal results demonstrating early systemic infection. Dr. Scotti opined that had Clara Maass initiated anti-microbial therapy on Joshua's second or even third visit, when he "had a much lighter bacterial burden," the infection would likely have been successfully treated and amputation avoided.

After the close of discovery, the settlement of plaintiffs' claims against the doctors, the physician assistants and their employer, and an eleventh hour adjournment of the fourth — and agreed upon — trial date by defendant nurses and Clara Maass, they moved for summary judgment asserting plaintiffs failed to present any evidence that the negligent care and treatment allegedly provided by defendant nurses was a proximate cause of Joshua's injuries. Plaintiffs opposed the motion, relying on Dr. Sixsmith's report that assessments of Joshua by defendant nurses "were deficient and incomplete and were a contributing factor of the misdiagnosis of Joshua Piperato."

Plaintiffs also submitted an affidavit from Dr. Sixsmith in opposition to the motion, stating that she agreed with Nurse Byerly's assessment that defendant nurses deviated from the standard of care. As she is not a nurse, however, Dr. Sixsmith explained she would not typically testify at trial to those deviations. Dr. Sixsmith stated her testimony at trial would focus on the "medical significance [of those deviations] based on [her] more than 40 years of experience as an emergency room physician."

Focusing on the role of nursing assessments in patient care, Dr. Sixsmith opined that such assessments not only provide important information to physicians handling the immediate care of the patient, but also to those reviewing the records of that care. She explained that assessments of an injured limb are critical to diagnosing compartment syndrome and deep vein thrombosis, including skin assessments, sensation assessments, capillary refill assessments, pulse assessments and pain assessments. "Compartment syndrome and [deep vein thrombosis] can cause changes in all of these assessments, that is why nursing assessments over time in the emergency can play a significant role in such a diagnosis." Dr. Sixsmith averred that "[c]ertainly, here the failure of the nurses to properly assess played a substantial role in the failure to diagnose."

A-3569-17T1

Dr. Sixsmith noted the undisputed fact that Joshua "was never seen by a physician" at Clara Maass, nor was one consulted. She opined:

> Incredibly, this was true even though this child presented to the ER on three consecutive days with worsening complaints as reported by the family, including things like unrelenting pain, fever, and crying all night. A child with a sprain should be getting better, not worse.
>
> . . . .
>
> The nurses at issue failed to assess pain. These failures . . . again caused harm to the patient. In compartment syndrome cases, pain assessments are very important, as typically, the first sign of compartment syndrome is pain out of proportion to the injury.

Dr. Sixsmith opined that had a physician been consulted on this case, the correct diagnosis would have been made. She opined that the nurses' failure to have a physician see Joshua was a "substantial cause of the misdiagnosis."

Plaintiffs' theory as to the nurses was clear; had they performed proper assessments and documented the pain and swelling in Joshua's leg, the physician assistants and their physician supervisors would have been alerted to undertake further inquiry to determine the cause of the boy's pain. Plaintiffs contended their failure to do so contributed to the amputation of Joshua's leg. To that end, they relied on the deposition testimony of one of the defendant

doctors responsible for reviewing and signing off on Joshua's chart, Dr. Jonathan Gamss. He testified that had there been documentation "in the chart that supported pain out of proportion to exam, so then there probably would have been a more involved workup that would be taking place of the patient," including "[h]aving an orthopedist involved, doing some other assessments of the neurovascular supply."

Plaintiffs argued that their expert on the nursing standard of care, Nurse Byerly, opined that defendant nurses failed to properly assess and document Joshua's complaint "of lower extremity pain and swelling" meaning "they could not communicate their assessment findings to the physician or [physician assistant]." In addition to their reliance on Dr. Sixsmith's opinion, plaintiffs also relied on Dr. Baren's opinion that the failure of the physician assistants and supervising doctors to ensure the necessary nursing assessments were adequately completed contributed to the resulting amputation of Joshua's leg. Finally, plaintiffs also submitted and relied on the reports of Drs. Farber and Scotti to the effect that had appropriate tests been done timely, a correct diagnosis and treatment would have followed and amputation would have been avoided.

A-3569-17T1

Defendants objected to plaintiffs' submission of Dr. Sixsmith's affidavit on the motion. They contended it was at odds with her deposition testimony and served after the close of discovery. Specifically, they relied on the following excerpt from Dr. Sixsmith's deposition:

> Q: And you're not offering any opinions as to causation in this case, are you?
>
> A: No.
>
> Q: I'm right, you're not—
>
> A: I'm not.

Defendants contended Dr. Sixsmith's was a sham affidavit offered to counter plaintiffs' failure to offer expert opinion that the negligent care allegedly provided by defendant nurses was a proximate cause of Joshua's injuries. See R. 4:46-5(b).

The trial court judge granted the motion. The judge found plaintiffs' "main report" from Dr. Byerly "had several pages with regard to the standard of care for each one of the nurses who had seen Joshua at the hospital." But "[w]hat this report did not do is give any opinion with regard to causation of the ultimate injury or damage" Joshua suffered. The judge refused to consider Dr. Sixsmith's affidavit because it was supplied months after the discovery end date and "was in contradiction not only to her report, but specific testimony in

13

her deposition where . . . she indicated that she was not providing an opinion on causation."

The judge found Dr. Farber's opinion "does not begin to address . . . the alleged negligence of the nurses.  It doesn't make reference to their actions, it doesn't give us an indication as to why the things he did suggest would have prevented this ultimate amputation."  The judge found Dr. Farber "just provides that in broad strokes and clearly is . . . talking about either the [physician assistants] or the doctors who would be ordering that type of diagnostic work-up."

Although satisfied plaintiffs established on the motion that defendant nurses deviated from the standard of care, the judge noted plaintiffs needed to have an expert "opine that the actions of these nurses resulted in the ultimate damage and/or injury" Joshua sustained.  The judge concluded "after reviewing all of the reports and going through Dr. Farber's deposition testimony trying to essentially bridge, for lack of terms, his opinion to Ms. Byerly's" she could not find plaintiffs had offered an opinion on causation.

Plaintiffs moved for reconsideration arguing three points.  First, as to the nurses, plaintiffs argued Dr. Sixsmith offered a causation opinion as to the nurses in her report and reiterated it at her deposition, and that defendants'

argument to the contrary relied on taking a snippet of the deposition out of context. Second, plaintiffs argued they established causation even without Dr. Sixsmith's opinion because the nurses failed to appreciate or document that Joshua was experiencing pain out of proportion to injury. Dr. Gamss testified that had pain out of proportion to injury been documented, there likely would have been "a more involved workup," which Drs. Farber and Scotti opined would have led to Joshua being properly diagnosed and treated, thus saving his leg.

Third, as to the hospital, plaintiffs argued it was not entitled to summary judgment even if the complaint against the nurses was dismissed. They claimed the judge overlooked an existing order entered by another judge dismissing plaintiffs' direct claims against Clara Maass, but specifically preserving "[t]he claims asserted against Clara Maass Medical Center under apparent authority" for the negligence of the settling defendant physicians and physician assistants. Specifically, plaintiffs contended Clara Maass was vicariously liable for the negligence of the physicians and physician assistants because plaintiffs accepted care for Joshua in the reasonable belief that those defendants were rendering treatment on behalf of Clara Maass even though they were actually employed by Emergency Medical Associates. See Estate of

Cordero, ex rel. Cordero v. Christ Hosp., 403 N.J. Super. 306, 310 (App. Div. 2008).

Defendants opposed the motion. Regarding the nurses, they argued plaintiffs were only rehashing the arguments they made in opposition to summary judgment. Regarding the hospital, defendants argued first that the prior order was not addressed to its vicarious liability for the settling defendant doctors and physician assistants, but only to its nurse employees. Alternatively, and although not having addressed the issue on their motion, defendants argued that plaintiffs executed a "General Consent: Inpatient, Outpatient & Emergency Department," putting them on notice that the physician and physician's assistants were not employees of the hospital, and thus that all of plaintiffs' claims against the hospital, including those based on apparent authority, were properly dismissed.

The judge denied the motion for reconsideration. In a written opinion, the judge ruled that plaintiffs had "failed to present evidence" relative to their apparent authority claim. Specifically, the judge found that although plaintiffs on reconsideration asserted "there was an 'abundance of testimony'" from Joshua's parents and grandmother that they believed the health care providers they encountered at Clara Maass were employees of the hospital, they merely

appended the deposition transcripts of those witnesses without specific citation to the portions supporting their contention.

The judge further noted that counsel offered nothing more at oral argument as to how plaintiffs "were led to believe that the treating nurses, physician assistants or doctors were Clara Maass employees." The judge wrote, "[t]o the contrary, evidence was presented that the plaintiff's mother had executed a document clearly outlining that the treating physicians were not employees of Clara Maass," and "that the treating physicians wore clothing that would identify the doctors as [Emergency Medical Associates] employees." The judge concluded that for those reasons "and arguments in defendant's brief," the claim of apparent authority fails.[2]

As to the nurses, the judge wrote "it was necessary for an expert to opine not only [on] the deviation of the nurses but also provide an opinion relating their alleged deviation to amputation of [Joshua's] leg." The judge declined

---

[2]  As we observed in Vartenissian v. Food Haulers, Inc., 193 N.J. Super. 603, 612 (App. Div. 1984), while it is not always fatal for a judge to rely on the reasons advanced by a party in deciding a motion, it is, of course "preferable that . . . a judge states his or her reasons with particularity." Rule 1:7-4 requires the court to "find the facts and state its conclusions of law . . . on every motion decided by a written order that is appealable as of right." Reviewing courts "should not be forced to examine the moving papers and attempt to glean the judge's reasons," Vartenissian, 193 N.J. Super. at 612, for orders terminating litigation in light of the requirements of Rule 1:7-4.

plaintiffs' suggestion "that the court should chain link the various opinions into a complete opinion that the nurses were negligent and a proximate cause of the ultimate injury," as plaintiff did not "provide any legal authority in this regard." The court concluded "[a]s no expert opined directly to the relation of the nursing deviations and the proximate cause of the amputation, the plaintiff's claims against the nursing defendants could not be proven." This appeal followed.

We review summary judgment using the same standard that governs the trial court. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012). As the parties essentially agreed on the material facts for purposes of the motion, our task is limited to determining whether the trial court's ruling on the law was correct. See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998). Because a trial court does not enjoy the advantage in discerning the law that it does in discerning the facts, a reviewing court owes no special deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Our function, like that of the trial judge, is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a

18

genuine issue for trial." Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 256 (2018) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). Only "when the evidence 'is so one-sided that one party must prevail as a matter of law'" should a court enter an order for summary judgment. Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

Having reviewed the evidence on the motion, we are satisfied summary judgment should not have been granted on this record. To the extent the trial court's opinions can be read to suggest plaintiffs needed to present a single report as to the alleged negligence of the nurses addressing both deviation and causation, we disagree.

As was pointed out by plaintiffs' counsel on the motion, as is typical in nursing malpractice claims, their nursing expert, Byerly, a registered nurse, although well-qualified to render an opinion on the nursing standard of care, was not qualified to render a medical opinion that the deviations she identified contributed to the amputation of Joshua's leg. See Sanzari v. Rosenfeld, 34 N.J. 128, 136 (1961). For expert opinion on causation, plaintiffs relied on Dr.

Sixsmith, a physician board certified in both emergency medicine and internal medicine.[3]

Contrary to the judge's finding on summary judgment that Dr. Sixsmith "in neither her written report or in her deposition . . . address[ed] proximate cause or causation between the nurse's treatment and the ultimate injury that Joshua sustained," Dr. Sixsmith actually did both. In her report, Sixsmith plainly stated, "[t]he nursing assessments performed by Nurse Iannuzzi, Nurse Nigro, Nurse Porcaro, and Nurse Guerrero were deficient and incomplete and were a contributing factor to the misdiagnosis of Joshua Piperato."

At Sixsmith's deposition, counsel for defendant nurses queried Dr. Sixsmith specifically about that opinion. After confirming with the doctor that she was not offering any opinion on standard of care but would instead defer to the "nursing expert in this case that plaintiff has retained with respect to standards of care applicable to nurses," counsel asked Sixsmith about the causation opinion she was offering as to the nurses.

_____

[3] Because we conclude the court erred in excluding Dr. Sixsmith's affidavit on the motion, we need not consider whether Dr. Gamss's testimony in conjunction with plaintiffs' other experts was sufficient to get plaintiffs to a jury on causation. We certainly see no impediment to plaintiffs pursuing those proofs in addition to presenting Dr. Sixsmith's testimony as to causation at trial.

20

Specifically, defense counsel asked: "And Doctor, is it correct that in reviewing your report dated November 17, 2016, on the fourth page of that report is the only one sentence [quoted above] that you offer by way of commentary on Nurse Iannuzzi, Nurse Nigro, Nurse Porcaro, and Nurse [G]uerrero?" When Sixsmith agreed, defense counsel pressed further:

Q: There's no other opinion that you have in this matter other than what's contained on page 4 in that one sentence?

A: Correct.

Q: I have nothing further.

As we earlier noted, in addition to providing plaintiffs a causation opinion relative to the nurses, Dr. Sixsmith also rendered an opinion that defendant physician assistants deviated from the standard of care, as did defendant emergency room physicians who supervised them and co-signed their records. At the end of Sixsmith's deposition, at which she was also questioned by two different lawyers representing defendant physicians and physician assistants as well as counsel for their employer, Emergency Medical Associates, counsel for one of the physicians and physician assistants engaged the doctor in the following exchange:

Q: And you're not offering any opinions as to causation in this case, are you?

21

A:    No.

Q:    I'm right, you're not —

A:    I'm not.

Q:    That was a poorly worded question.  And there's nothing in the chart or any of the deposition testimony to support that there was any visual abnormality of the left calf on [Joshua's second visit to Clara Maass] correct?

A:    Correct.

Q:    And am I correct that you are not offering any opinion that there was a deviation from the standard of care on [Joshua's first visit]?

A:    Correct.

Q:    Would you agree that an ankle sprain in a 7-year-old is not a particularly unusual occurrence?

A:    Very common.

Q:    And that following a sprained ankle in a 7-year-old, that child can experience pain for several days; is that right?

A:    Yes.

Q:    The pain isn't expected to go away within 48 hours, is it?

A:    No.

Q:     And are you offering an opinion — you talked
       earlier about getting a CT or an MRI or
       ultrasound on [Joshua's second visit].  Are you
       offering any opinions as to what those studies
       would have shown had they been done?

A:     No.

Q:     Okay.  That's all I have.  Thank you.

At oral argument on the summary judgment motion, counsel for defendant nurses and Clara Maass quoted only that portion of the exchange in which Dr. Sixsmith said she was not offering any opinions as to causation in the case, omitting that the question was asked of the doctor by a lawyer representing different parties, and likewise omitting her own exchange with the doctor in which Sixsmith confirmed the causation opinion she was offering as to defendant nurses.[4]  We have no need to explore whether candor required

---

[4]  When plaintiffs' argued on the summary judgment motion that counsel for defendant nurses had the opportunity to ask Dr. Sixsmith at deposition the basis for her opinion, the judge observed, "I assume she strategically avoided that . . . given the doctor's report."  We have no comment on counsel's strategy. We note only that having chosen not to query the doctor about the basis for her opinion when provided the opportunity, we see no grounds for objecting to an affidavit conveying the information the doctor would have supplied at deposition had counsel asked.  See McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 172 (App. Div. 1987) (holding a party has "no right to eschew discovery and then object to the admission of the materials that were fairly obtainable through interrogatories or depositions, and which logically flowed from the expert report already provided").

more.  We note only that the representations led the trial court judge to conclude, erroneously, that the affidavit from Dr. Sixsmith submitted on the motion contradicted "specific testimony in her deposition where she indicated . . . that she was not providing an opinion on causation."

As Dr. Sixsmith's affidavit plaintiffs submitted in opposition to summary judgment was not at odds with either her report or her deposition testimony, it was a mistaken application of discretion for the judge to refuse to consider it. See Shelcusky v. Garjulio, 172 N.J. 185, 201-02 (2002) (holding "[c]ourts should not reject alleged sham affidavits . . . where confusion or lack of clarity existed at the time of the deposition questioning and the affidavit reasonably clarifies the affiant's earlier statement").  If counsel for defendants was genuinely confused by Dr. Sixsmith's deposition testimony, a request for an N.J.R.E. 104 hearing may have been in order before arguing to the motion judge that plaintiffs had submitted a sham affidavit in order to defeat summary judgment.

As plaintiffs established a prima facie case of negligence against the nurses sufficient to defeat summary judgment based on the expert opinions of Nurse Byerly and Dr. Sixsmith, summary judgment was also improperly entered in favor of defendant Clara Maass, as the hospital is subject to liability

24

based on a theory of respondeat superior. See Arthur v. St. Peters Hosp., 169 N.J. Super. 575, 579-80 (Law Div. 1979). We are also convinced that summary judgment was likewise improperly entered in favor of the hospital on plaintiffs' theory of apparent authority.

The record is clear that Clara Maass never moved for summary judgment on plaintiffs' apparent authority claim, which was clearly preserved by prior order in the case.[5] Thus it was completely improper for the hospital to address the claim on plaintiffs' motion for reconsideration. "The first prerequisite . . . of due process is fair notice, so that a response can be prepared and the respondent fairly heard." Nicoletta v. N. Jersey Dist. Water Supply Co., 77 N.J. 145, 162 (1978) (citing Avant v. Clifford, 67 N.J. 496, 525 (1975)). As the hospital never sought judgment on the apparent authority claim, it was error for the judge to decide on reconsideration that summary judgment was

---

[5] Defendants' argument on the reconsideration motion that the order preserved only plaintiffs' claims against the hospital based on its vicarious liability for defendant nurses was plainly wrong. Defendant nurse employees possessed actual authority to act on behalf of the hospital. See Arthur, 169 N.J. Super. at 579-80 (explaining doctrine of respondeat superior in hospital context). The apparent authority claims obviously related only to those physician and physician assistant employees of defendant Emergency Medical Associates, who were without actual authority to act on behalf of the hospital. See Basil v. Wolf, 193 N.J. 38, 67 (2007) (citation omitted) (explaining apparent authority in hospital context).

proper as plaintiffs "failed to present evidence relative to this claim." Plaintiffs had no obligation to respond to a motion for judgment the hospital never made.

"[Summary judgment] is designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at trial," Brill, 142 N.J. at 530 (quoting Ledley v. William Penn Life Ins. Co., 138 N.J. 627, 641-42 (1995)), not "shut a deserving litigant from his [or her] trial," id. at 540 (quoting Judson v. Peoples Bank & Tr. Co., 17 N.J. 67, 77 (1954)). As we are satisfied plaintiffs have demonstrated bona fide causes of action entitling them to fully expose their case to a jury, we reverse and remand the matter for trial. See id. at 541.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3569-17T1