692 A.2d 552

ROBERT KELLY, PLAINTIFF–APPELLANT, v. BURGESS LEE
BERLIN, M.D. AND STEPHEN TODER, M.D., DEFENDANTS–
RESPONDENTS, AND HOSPITAL CENTER AT ORANGE, DE-
FENDANT.

Superior Court of New Jersey
Appellate Division

Argued March 18, 1997—Decided April 29, 1997.

Before MICHELS, MUIR, Jr., and KLEINER, JJ.

*Laurence H. Olive* argued the cause for appellant Robert Kelly.

*David P. Weeks* argued the cause for respondent Burgess Lee Berlin, M.D. (*Ruprecht & Hart*, attorneys; *Mr. Weeks*, of counsel; *Michael R. Ricciardulli*, on the brief).

*Robert J. Mormile* argued the cause for respondent Stephen Toder, M.D. (*Mortenson and Pomeroy*, attorneys; *Scott A. Parsons*, of counsel; *Mr. Mormile*, on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiff Robert Kelly appeals from the Law Division's involuntary dismissal of his medical malpractice action against defendants Burgess Lee Berlin, M.D. (Dr. Berlin) and Stephen Toder, M.D. (Dr. Toder).

The record shows that plaintiff was injured in an automobile accident on January 26, 1990. Plaintiff subsequently instituted a negligence action against the driver of the automobile with which he had the accident. As a result of the accident, plaintiff went to Saint Barnabas Medical Center's emergency room on January 28, 1990 and was referred to Dr. Berlin, an orthopedic physician, on February 1, 1990. When Dr. Berlin first saw him, plaintiff complained of headaches, neck and shoulder pain, and lower back pain. Dr. Berlin initially diagnosed plaintiff with acute cervical myositis, bursitis and tendinitis in the shoulder, and post-traumatic headaches. Dr. Berlin, however, did not diagnose any problems with plaintiff's lower back. Dr. Berlin then recommended a course of treatment, but plaintiff returned on February 15, 1990 with similar complaints. Dr. Berlin then had a MRI (magnetic resonance imaging) and electromyographic evaluation done on plaintiff's middle and upper back and his neck. Because plaintiff had persistent pain, Dr. Berlin had him admitted to Orange Memorial Hospital on April 17, 1990 through April 24, 1990; while at the hospital, plaintiff was put in traction. Dr. Berlin last treated plaintiff on August 28, 1990 and advised plaintiff to perform certain exercises to minimize his pain. Dr. Berlin gave plaintiff a "guarded" prognosis.

While plaintiff was in the hospital in April of 1990, Dr. Berlin sent plaintiff's x-rays to Dr. Toder, a radiologist, for evaluation. Dr. Berlin had included among the x-rays, x-rays of plaintiff's cervical spine and, mistakenly, x-rays of another patient's lumbar spine. In fact, no x-rays had ever been ordered or taken of plaintiff's lumbar spine. The x-rays were delivered in a jacket with plaintiff's name on the front, but the other patient's name plate was visible on the actual lumbar x-rays. In his report to Dr. Berlin, Dr. Toder noted that the lumbar x-rays revealed that the lumbar curvature was somewhat straightened, possibly due to spasm, but that the overall lumbar spine was normal.

On November 20, 1990, Dr. Berlin issued a report to plaintiff outlining the above events: plaintiff's complaints, his (Dr. Berlin's) diagnosis, and his treatment of plaintiff. In the report, Dr. Berlin apparently relied on Dr. Toder's reading of the other patient's lumbar x-ray because Dr. Berlin stated, "Lumbar spine films, taken outside the hospital, were read on April 18, 1990, which showed a straightened lumbar curvature consistent with spasm." In March of 1991, in reliance on this report, plaintiff settled his automobile accident action against the negligent driver for $70,000.

In the fall of 1991, however, plaintiff was still suffering from lower back pain and went to see Dr. Paul O'Connor. Dr. O'Connor diagnosed plaintiff with spondylolisthesis of the L5–S1 vertebrae and was of the opinion that the injury was causally related to the automobile accident. Spondylolisthesis occurs when one vertebrae becomes partially dislocated and slips forward on the vertebra below it.

Because plaintiff was not aware of the spondylolisthesis when he entered into the settlement agreement for the automobile accident, the amount of the settlement did not encompass or reflect that injury. Plaintiff thereupon instituted this action against Dr. Berlin, Dr. Toder, and Hospital Center at Orange (HCO). Plaintiff claimed that Dr. Toder negligently failed to realize that the lumbar x-rays were of another patient. Plaintiff also argued that Dr. Berlin negligently failed to order x-rays of plaintiff's lumbar

area, negligently provided Dr. Toder with the wrong x-rays, and negligently failed to properly diagnose plaintiff's condition. In addition, plaintiff asserted that HCO was liable for the negligence of Dr. Toder and other unnamed employees.

Plaintiff further argued that because he had already settled the underlying automobile accident case, he was precluded from making further claims against the driver for his spondylolisthesis condition. He also alleged that if he had known of the spondylolisthesis at the time of the settlement, he would have settled for a greater sum. Plaintiff, thus, sought to recover, among other damages, the moneys he would have received by way of settlement if Dr. Berlin and Dr. Toder had properly diagnosed his spondylolisthesis. Plaintiff also originally sought to recover damages for aggravation of his injuries due to lack of treatment caused by Dr. Berlin's and Dr. Toder's failure to diagnose his spondylolisthesis, but subsequently abandoned this claim.

Plaintiff did not proffer any expert witnesses or reports establishing that Dr. Berlin's and Dr. Toder's conduct deviated from the standard of care to which each was required to adhere. In addition, plaintiff did not offer any expert testimony calculating the amount of damages he would have received by way of settlement if his spondylolisthesis condition had been known to him prior to the settlement of the automobile accident case. The only expert offered by plaintiff was Dr. Paul Hobeika, M.D., who was of the opinion that plaintiff's spondylolisthesis was causally related to the automobile accident.

Dr. Berlin moved for summary judgment on the ground that plaintiff had failed to proffer an expert report establishing the appropriate standard of care required of him (Dr. Berlin) in this matter. While the record is not entirely clear, apparently HCO also moved for summary judgment. The trial court denied defendants' motions, but compelled plaintiff to identify all experts within twenty days and to provide copies of all expert reports as to deviation from the standards of care, proximate cause, and damages within sixty days or be barred from producing such testimo-

ny at trial. Plaintiff failed to comply with the order, and HCO and Dr. Berlin again moved for summary judgment. Plaintiff then moved for a thirty-day extension to secure an expert report and also argued that expert testimony was not needed because a *prima facie* case could be established under the theories of common knowledge and *res ipsa loquitur.* The trial court then signed a consent order entered into by Dr. Berlin, HCO, and plaintiff that required plaintiff to provide all expert reports by a specified date and declared that plaintiff would be limited to the use of those expert reports at trial. In addition, the consent order provided that if plaintiff did not produce the expert reports within the specified time, plaintiff would limit his claims against defendants to the doctrine of *res ipsa loquitur* and common knowledge. Subsequently, the trial court granted summary judgment in favor of HCO.

Thereafter, Dr. Toder moved for partial summary judgment, alleging among other things that New Jersey law did not recognize the damages claimed by plaintiff. Dr. Berlin joined in this motion and also claimed that he did not have a duty to render accurate medical reports to plaintiff's attorney in connection with plaintiff's automobile accident case. Before the return date of the motion, Dr. Toder also moved for summary judgment on the ground that plaintiff's liability expert had improperly issued a net opinion. The trial court denied the motions. Subsequently, a consent order was entered into by Dr. Berlin, Dr. Toder, and plaintiff setting a trial date and specifically providing that plaintiff would employ as his sole liability expert Dr. Paul Hobeika, whose testimony would be limited to the subject matter of his report. The consent order also provided that Dr. Hobeika would not testify to any applicable standards of care or deviation therefrom and that instead plaintiff would rely on the theories of *res ipsa loquitur* and common knowledge to prove his case.

Prior to trial, Dr. Berlin filed a motion *in limine* to dismiss plaintiff's complaint, claiming that he did not owe any duty to plaintiff to accurately detail plaintiff's condition in the medical

report and that plaintiff had failed to offer expert testimony with regard to the settlement value of plaintiff's claims. Since it appeared that plaintiff would not proffer any expert testimony as to the defendant doctors' standards of care; their alleged deviation therefrom; and plaintiff's claim of damages, specifically expert testimony establishing the difference between the amount that plaintiff received in settlement and the amount plaintiff would have received had he known of his spondylolisthesis condition prior to the settlement, the trial court granted a judgment of involuntary dismissal in favor of Dr. Berlin and Dr. Toder. Plaintiff appealed.

Plaintiff seeks a reversal of the involuntary dismissal and a remand for trial, contending that (1) the trial court erred in ruling that expert testimony was necessary to establish the appropriate standards of care because the common knowledge and *res ipsa loquitur* doctrines obviated the need for such testimony and that expert testimony was not necessary to prove his damages; (2) the trial court was precluded from granting Dr. Berlin's *in limine* motion due to the "law of the case" doctrine; and (3) the trial court abused its discretion by granting Dr. Berlin's motion *in limine,* resulting in the involuntary dismissal of his claim. We disagree and affirm.

We are satisfied from our study of the record and the arguments presented that the trial court properly granted Dr. Berlin's motion *in limine* on the ground that plaintiff failed to proffer any expert testimony as to defendants' appropriate standards of care, their alleged deviation therefrom, and damages. Therefore, we are also satisfied that the trial court properly entered a judgment of involuntary dismissal in favor of Dr. Berlin and Dr. Toder. Moreover, all of the issues of law raised are clearly without merit. *R.* 2:11–3(e)(1)(E).

Additionally, we emphasize that "in the ordinary medical malpractice case 'the standard of practice to which [the defendant-practitioner] failed to adhere must be established by expert testimony[.]' " *Rosenberg ex rel. Rosenberg v. Cahill,* 99 *N.J.* 318, 325,

492 *A*.2d 371 (1985) (alteration in original) (quoting *Sanzari v. Rosenfeld,* 34 *N.J.* 128, 134–35, 167 *A*.2d 625 (1961)). *See also Walck v. Johns–Manville Prod. Corp.,* 56 *N.J.* 533, 562, 267 *A*.2d 508 (1970); *Schueler v. Strelinger,* 43 *N.J.* 330, 345, 204 *A*.2d 577 (1964); *Ritondo ex rel. Ritondo v. Pekala,* 275 *N.J.Super.* 109, 115, 645 *A*.2d 802 (App.Div.), *certif. denied,* 139 *N.J.* 186, 652 *A*.2d 174 (1994). The reason that a physician's standard of care, and deviation therefrom, must be established by expert testimony is "that a jury generally lacks the 'requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert.'" *Rosenberg ex rel. Rosenberg v. Cahill, supra,* 99 *N.J.* at 325, 492 *A*.2d 371 (citation omitted).

There are, however, exceptions to this general rule. Experts are not needed to establish the appropriate professional standards of care where either the doctrine of *res ipsa loquitur* or the doctrine of common knowledge applies. The *res ipsa loquitur* doctrine applies

"where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect."

[*Buckelew v. Grossbard,* 87 *N.J.* 512, 525, 435 *A*.2d 1150 (1981) (quoting *Bornstein v. Metropolitan Bottling Co.,* 26 *N.J.* 263, 269, 139 *A*.2d 404 (1958)).]

*Res ipsa loquitur* permits a jury to infer negligence, but the jury is free to accept or reject this inference. *Id.* at 526, 435 A.2d 1150 (citations omitted).

The common knowledge doctrine applies when "[t]he facts of a given case [are] such that the common knowledge and experience possessed by lay[persons] ... enable a jury to conclude, without expert testimony, in a malpractice action as in any other negligence action that a duty of care has been breached." *Klimko v. Rose,* 84 *N.J.* 496, 503–04, 422 *A*.2d 418 (1980). "The basic postulate for the application of the doctrine therefore is that the issue of negligence is not related to technical matters peculiarly within the knowledge of medical ... practitioners." *Sanzari v.*

*Rosenfeld, supra,* 34 *N.J.* at 142, 167 *A.*2d 625. When the common knowledge doctrine is applied, "the jury itself is allowed 'to supply the applicable standard of care and thus . . . obviate the necessity for expert testimony relative thereto.' The trial of such a case is essentially no different from 'an ordinary negligence case.' " *Rosenberg ex rel. Rosenberg v. Cahill, supra,* 99 *N.J.* at 325, 492 *A.*2d 371 (citations omitted).

■ Yet, it will only be in the "unusual" professional malpractice case that the common knowledge doctrine will be invoked. *Ibid.* Usually, the common knowledge doctrine will be applied "where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Ibid. See, e.g., Magner v. Beth Israel Hosp.,* 120 *N.J.Super.* 529, 534, 295 *A.*2d 363 (App.Div.1972) (finding that a jury could conclude from "common experience" that defendant doctor was negligent when plaintiff suffered burns while unconscious during surgery), *certif. denied,* 62 *N.J.* 199, 299 *A.*2d 733 (1973); *Tramutola v. Bortone,* 118 *N.J.Super.* 503, 512–13, 288 *A.*2d 863 (App.Div.1972) (ruling that a jury was competent to resolve issue of defendant physician's negligence, without expert testimony, where x-rays obviously showed needle in plaintiff's chest but defendant had failed to inform the plaintiff of the needle), *rev'd in part on other grounds,* 63 *N.J.* 9, 304 *A.*2d 197 (1973); *Steinke v. Bell,* 32 *N.J.Super.* 67, 70, 107 *A.*2d 825 (App.Div.1954) (holding that laypersons could determine through their common knowledge whether defendant dentist was negligent when he extracted the wrong tooth). *See also Becker v. Eisenstodt,* 60 *N.J.Super.* 240, 246–47, 158 *A.*2d 706 (App.Div.1960).

■ Although related, there is a difference between *res ipsa loquitur* and the common knowledge doctrine as explained by our Supreme Court in *Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 141, 167 *A.*2d 625:

In *res ipsa* cases, plaintiff need only prove his injury, and need not prove a standard of care or a specific act or omission. Ordinarily, the common knowledge

doctrine is applied in a malpractice case after the plaintiff proves his injury and a causally related act or omission by the defendant.

■ We cannot say that it is within the common knowledge of a lay jury to determine whether Dr. Berlin's treatment of plaintiff constituted a deviation from the accepted standard of care. A lay jury does not have the training, skill, or knowledge to determine whether, based on plaintiff's complaints and plaintiff's physical condition, the required standard of care necessitated further inquiry into plaintiff's lower back problems at the time Dr. Berlin was examining him. Moreover, even if a lay jury could decide that plaintiff's condition warranted further concern, it could not determine what additional tests or examinations needed to be performed to satisfy the standard of care, or whether those additional tests or examinations would have even shown plaintiff's spondylolisthesis. Simply put, lay persons do not have the knowledge or skill to analyze plaintiff's symptoms and conclude what a reasonable medical standard of care required Dr. Berlin to do under the circumstances.

Instead, for plaintiff to have succeeded in this malpractice action, he would have needed to have offered qualified expert medical testimony showing that plaintiff's conditions would have led a reasonable physician to perform further tests, including x-rays, and that those tests would have revealed plaintiff's spondylolisthesis. In addition, because it cannot be said that plaintiff's spondylolisthesis ordinarily would not have been overlooked but for Dr. Berlin's negligence, *res ipsa loquitur* also does not apply in the present situation. Consequently, the trial court properly granted the judgment of involuntary dismissal in favor of Dr. Berlin.

■ We are also satisfied that the trial court properly granted a judgment of involuntary dismissal in favor of Dr. Toder. Even assuming that it was within the jury's common knowledge to determine whether a reasonable standard of care permitted him, as a radiologist, to rely on Dr. Berlin's labeling of a x-ray slip or whether it required him to cross-reference the name on the x-ray

with the name on the slip jacket, Dr. Toder would still not be under any liability to plaintiff in the unique circumstances of this case. Dr. Toder would not be liable because even if Dr. Toder had a duty and fulfilled it by reporting the inconsistency to Dr. Berlin, a different outcome undoubtedly would not have occurred. If Dr. Toder had reported the inconsistency, plaintiff's spondylolisthesis condition still would not have been detected prior to plaintiff's settlement of the claim with the driver because Dr. Berlin had not ordered any such x-rays. Thus, Dr. Toder could not have discovered plaintiff's spondylolisthesis condition even if he had discovered the name discrepancy on the x-rays and, therefore, plaintiff still would not have been diagnosed with the spondylolisthesis condition prior to the settlement.

■ The trial court also properly held that expert testimony was necessary to establish the amount of money that plaintiff would have been entitled to in his settlement if plaintiff had been diagnosed with the spondylolisthesis condition prior to the settlement.

■ It is fundamental that a plaintiff must "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." *Lane v. Oil Delivery, Inc.,* 216 *N.J.Super.* 413, 420, 524 *A.*2d 405 (App.Div.1987) (citation omitted). Damage awards may not be based on mere speculation. *See American Sanitary Sales Co. v. State,* 178 *N.J.Super.* 429, 436, 429 *A.*2d 403 (App.Div.) ("We emphasize that we do not expect nor ask the trial judge to engage in mere speculation [in assessing damages.]"), *certif. denied,* 87 *N.J.* 420, 434 *A.*2d 1094 (1981); *Lewis v. Read,* 80 *N.J.Super.* 148, 174, 193 *A.*2d 255 (App.Div. 1963) ("The law abhors damages based upon mere speculation."). Thus, in general, "[a] jury should not be allowed to speculate without the aid of expert testimony in an area where laypersons could not be expected to have sufficient knowledge or experience." Biunno, *Current N.J. Rules of Evidence,* comment 2 on *N.J.R.E.* 702 (1996–97).

Expert testimony was necessary to determine the fair settlement value of plaintiff's motor vehicle accident claim had plaintiff been aware of his spondylolisthesis condition. Without expert testimony, a jury simply does not have the knowledge, training, or experience to decide the settlement value of plaintiff's claim. While juries may generally determine damages in the ordinary case, the trial court properly concluded that laypersons do not have the knowledge, from their common experience, to evaluate and determine damages in a case of this kind, that is, to determine the difference between the amount plaintiff actually received in his settlement and the amount he would have received had his lower back condition been made known prior to the settlement.

The many factors that go into a settlement are not within the knowledge of the average juror. An expert in the settlement of claims, such as an experienced torts attorney or an experienced claims adjuster, is necessary to explain the various factors which are taken into consideration in the settlement of a case of this kind. Such an expert could explain which factors are relevant and how they affected this matter to enable the jury to determine whether the defendant doctors' negligence caused plaintiff to settle for a lower amount than he otherwise would have, and, if so, the amount of damages plaintiff sustained as a result. For example, such expert testimony could render a comparison of similar claims in the area, an analysis of how plaintiff's other injuries would have affected the settlement of his lower back injury, an opinion as to the value of plaintiff's lower back injury in light of its projected severity when the case settled, and an analysis of how legal issues would have affected the settlement amount. *See Duncan v. Lord,* 409 *F.Supp.* 687, 692–93 (E.D.Pa. 1976); *Fishman v. Brooks,* 396 *Mass.* 643, 487 *N.E.*2d 1377, 1380–81 (1986). As the Federal District Court in *Jiffy Foods Corp. v. Hartford Accident and Indem.,* 331 *F.Supp.* 159, 160 (W.D.Pa. 1971), stated in determining how the reasonableness, or unreasonableness, of a settlement amount would be proved:

The issue we must resolve is this: may the third party plaintiff, Hartford, offer proof of the reasonableness of the settlement agreement in the *Howard* case by

expert testimony, or is it necessary to in fact present the facts of the *Howard* case to a jury for its determination of liability and the amount thereof.

We conclude that what confronts us is a question of the reasonableness of a business decision. What a particular jury in fact would decide as to the liability of Jiffy to *Howard* or the amount of damages is not particularly material. We are concerned with the soundness of a business judgment to settle particular litigation for a given amount. *Such a decision properly requires consideration of available factual information, an understanding of the applicable law, and knowledge of jury verdicts in the forum in which the action is to be tried. These are the tools which the litigator must employ in evaluating any given case. He must determine the reasonable value of the case in view of the risks of litigation. An attorney may decide to settle a case that could have been won, but the fact that it might have been won does not automatically make his settlement unreasonable. Litigation is a complex business requiring the attention of the specialists. The reasonableness of what such specialists do in a given case is the type of technical matter in which the lay jury can be helped by the opinions of experts, for we are dealing with a question not of what a reasonably prudent man would do, but what a reasonable prudent attorney would do.*

We conclude that evidence of the reasonableness of a $400,000.00 settlement in a wrongful death action pending in the Federal District Court of Cleveland, Ohio, in 1968 is properly presentable by the testimony of qualified experts.

[Emphasis added.]

Since plaintiff's damage claim is based on the difference between the amount he actually received in settlement and the amount he claims he would have received had he known of his true condition, rather than on a difference between jury verdicts, the trial court properly held that expert testimony was necessary to establish damages. Contrary to plaintiff's contention, the jury should not be permitted to value his undiagnosed spondylolisthesis injury without reference to the injuries he was compensated for in the settlement and then have the court mold the verdict by making a *pro tanto* reduction in the verdict by the amount of the settlement. *See Gautam v. De Luca,* 215 *N.J.Super.* 388, 398, 521 *A.*2d 1343 (App.Div.), *certif. denied,* 109 *N.J.* 39, 532 *A.*2d 1107 (1987). *But see Illiano v. Seaview Orthopedics,* 299 N.J.Super. 99, 108, 690 A.2d 662 (App.Div.1997); *Spaulding v. Hussain,* 229 *N.J.Super.* 430, 432, 439, 444–45, 551 *A.*2d 1022 (App.Div.1988).

Finally, we are satisfied that the "law of the case" doctrine did not preclude the trial court on the motion *in limine* from holding that expert testimony was necessary to establish (1) the

appropriate standards of care, (2) defendants' deviation therefrom, and (3) the amount of damages. Nothing submitted on this appeal shows that the trial court, at any time prior to the *in limine* motion, specifically ruled that expert testimony was not necessary to establish a *prima facie* case against defendants or that plaintiff's cause of action against Dr. Berlin and Dr. Toder could be established by the common knowledge doctrine or by *res ipsa loquitur*. At one point, the trial court stated that the common knowledge doctrine and *res ipsa loquitur* "may" apply in the present matter, and even then the trial court apparently limited its determination to Dr. Toder. We also presumed as much in our discussion of Dr. Toder's liability, *supra.* However, the trial court then stated that it was not going to make any final determinations at the time regarding the applicability of the doctrine of common knowledge and *res ipsa loquitur*. More importantly, the trial court expressly determined that the parties could make further motions on the subject through *in limine* motions or motions at trial.

The trial court also entered a consent order that precluded plaintiff from relying on expert testimony to establish the applicable standard of care, or deviation therefrom, if plaintiff did not secure such an expert in a timely fashion, and also required plaintiff to rely on the theory of *res ipsa loquitur* and the doctrine of common knowledge to support his case if he did not timely produce an expert. When plaintiff failed to produce such experts, the trial court entered another consent order which stated that plaintiff would not present expert testimony on the relevant standards of care, or deviation therefrom, and would instead rely on the theories of *res ipsa loquitur* and common knowledge to prove his case. None of these orders can be read or construed to mean that the trial court decided that either doctrine was applicable to this case or could be relied upon to establish a cause of action.

Accordingly, the judgment of involuntary dismissal in favor of Dr. Berlin and Dr. Toder is affirmed substantially for the reasons expressed by Judge Kirsten in his oral opinion of July 17, 1995.