**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2335-23

SHEILA ELIJAH, administratrix
ad prosequendum and general
administratrix of the Estate of
ROBERT ELIJAH, deceased,

     Plaintiff-Appellant,

v.

PORT AUTHORITY TRANS-
HUDSON CORPORATION,

     Defendant-Respondent.

_____

Argued September 8, 2025 – Decided October 1, 2025

Before Judges Sabatino, Natali, and Bergman.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2137-20.

Timothy J. Foley argued the cause for appellant (Foley & Foley, and Don P. Palermo, Jr., attorneys; Timothy J. Foley and Don P. Palermo, Jr., of counsel and on the briefs).

Thomas R. Brophy (Port Authority Law Department) argued the cause for respondent.

PER CURIAM

Plaintiff Sheila Elijah, Administratrix ad Prosequendum and General Administratrix of the Estate of Robert Elijah,[1] appeals from the court's order granting defendant Port Authority Trans-Hudson Corporation's ("PATH") summary judgment application and dismissing her wrongful death action brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60.  We affirm.

I.

We summarize the facts from the summary judgment record, viewing them in a light most favorable to plaintiff.  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).  Elijah worked for defendant since 2001 when, on March 15, 2020, in the early days of the COVID-19 pandemic, he hugged his coworker, Juan Martinez, in the PATH employee's locker room after resolving an argument.  Neither Martinez nor Elijah wore a mask at the time.

Unbeknownst to Elijah, before the March 15th incident, he felt "a little off . . . good enough to go to work, but . . . just a little off."  In his trial testimony, Martinez described it as "like, a head cold or something," and his symptoms

_____

[1]  For clarity, because plaintiff Sheila Elijah and decedent Robert Elijah share a common surname, we refer to Sheila as plaintiff and Robert as Elijah, intending no disrespect.

A-2335-23

included dizziness, coughing, heavy breathing, and a "crazy headache." As a smoker, he stated it was normal for him to have a slight cough at that time of year. His symptoms including the headache did not prevent him from going to work. He took Tylenol and Nyquil to deal with the discomfort.

The next day, Martinez's symptoms worsened. He called out sick, and PATH management instructed him to quarantine for fourteen days. Because Elijah had been in close contact with him, PATH also sent Elijah home and instructed him to quarantine for fourteen days as well.

As his symptoms worsened, Martinez went to a local hospital for COVID-19 testing where staff administered a nasal swab. Before Martinez left, an unidentified hospital staff member told him to continue his fourteen-day quarantine. After calling numerous times to ascertain the results of his COVID-19 test, Martinez learned the hospital had lost his test results.

Martinez returned home where he continued to take Tylenol and his wife made home remedies like tea "because [he] thought it was a seasonal cold." While he separated himself from his family, they continued to share a bathroom. No one else in Martinez's household experienced any COVID-19 symptoms.

In August 2020, PATH mandated Martinez and his immediate colleagues undergo testing when another PATH employee with whom Martinez closely

worked "tested positive or had symptoms." While Martinez exhibited no COVID-19 symptoms, he went to a different health care provider for testing. He received another nasal swab to determine if he currently at that time had COVID-19 and a blood test to check for antibodies, explaining he "wanted to know where [he] stood" regarding his March incident. Martinez's nasal swab was negative. His blood test, however, revealed he had antibodies, indicating he had COVID-19 at some indeterminate point.

Prior to the March 15th incident with Martinez, Elijah practiced social distancing and purchased masks for his family to reduce his and his family's risk of contracting COVID-19. He was "insistent" his family wear masks and gloves when they left the house. While Elijah minimized his trips out of the house, and would wear masks and gloves when he did leave, he continued to go to the grocery store and Costco and continued to use public transportation when commuting to work.

During the first week of his fourteen-day quarantine period after hugging Martinez, Elijah did not display symptoms of COVID-19. He became symptomatic towards "the end of the second week going into the third week."

Concerned with the severity of his illness, Elijah's son called an ambulance which transported him to Bayshore Memorial Hospital, where Elijah

was later admitted on April 3, 2020. Although the hospital documents are not in our record, plaintiff's expert in epidemiology, Dr. Edward Peters, DMD, SM, ScD, testified that Elijah's hospital records indicate, upon admission, he was diagnosed with influenza A, pneumonia in the right lung, insulin-dependent diabetes, an acute respiratory infection, and COVID-19. The Bayshore medical staff, however, tested Elijah for COVID-19 three times, all with negative results. Elijah's symptoms continued to worsen, and despite being intubated, died in April 2020. Elijah's death certificate attributed his cause of death to "respiratory distress, secondary to COVID[-]19."[2]

In plaintiff's FELA-based complaint, she alleged Elijah contracted COVID-19 from Martinez because Elijah "was not wearing a mask because PATH had instructed its workers at safety meetings not to wear masks at work unless they were performing their specific job functions." (emphasis in original). Further, plaintiff claimed PATH ordered its foremen to have their respective employees return masks that they were issued and thus

> recklessly exposed [Elijah] to the COVID-19 virus when it knew from his medical file that he was a higher risk of contracting [COVID-19] due to the fact that: 1) he was a Type II Diabetic and was prescribed insulin; 2) he was African American; 3) he was over [sixty] years of age; and, 4) he worked in and near New York

---

[2] The parties did not include the death certificate in our record.

A-2335-23

City, the largest city in the United States, with more COVID-19 cases than any other area in the entire country.

Prior to trial, defendant filed its first motion for summary judgment, which the court denied along with its subsequent application for reconsideration. In addition, prior to the jury's empanelment, the court addressed defendant's application to bar Elijah's death certificate from being admitted into evidence.

After considering the parties' written submissions and oral arguments, it granted defendant's in limine motion and explained the death certificate was inadmissible as "a classic net opinion that must not be allowed in the absence of testimony by the author elaborating the basis for the conclusions reached therein." Quail v. Shop-Rite Supermarkets, Inc., 455 N.J. Super. 118, 132-33 (App. Div. 2018) (citation omitted). The court further found the death certificate and the conclusions contained therein constituted a complex medical diagnosis requiring testimony from the author, who plaintiff did not plan to call as a witness.

The matter proceeded to trial during which the jury heard testimony for six days. The plaintiff presented a total of twelve witnesses, and as noted, the

6

court qualified Dr. Peters, as an expert in the field of epidemiology.[3]  The

plaintiff did not call any of Elijah's treating physicians nor did plaintiff call a

medical expert.  Dr. Peters explained epidemiology to the jury as the

> basic science of public health.  Really what
> epidemiologist[s] do is [they] study the distribution and
> determinance of disease and injury in populations.  So
> what is distribution?  Person, place, and time.  Who gets
> it?  . . . [W]ho's affected, right?  So the other part of
> determinance, what causes disease.  So we have
> projects, research, surveillance, that describes the
> patterns of disease in populations, as well as research
> that looks  at what causes disease, the determinance.

Questioning from defendant's counsel confirmed Dr. Peters was originally

trained as a dentist and had no training as a workplace safety expert, industrial

hygienist, toxicologist, nor was he a medical doctor.

Dr. Peters opined it was "highly probable" Elijah contracted COVID-19

"through his close contact hugging of . . . Martinez, who [defendant] suspect[ed]

at that time was infected with COVID[-19]."  Dr. Peters stated he reviewed all

the available records regarding decedent's conduct and potential exposures, the

timing of the known exposure and the onset of symptoms, and the epidemiology

of COVID-19.  Based on his review, he opined Martinez had COVID-19 due to

---

[3]  Plaintiff's other witnesses included ten lay witnesses and one expert economist.

his "antibody test and some of the clinical information available in mid-March." Dr. Peters noted, however, he could not "say with any certainty" that Elijah contracted COVID-19 from hugging Martinez, and "you can't have any high degree of certainty . . . which [contact] is the smoking gun."

Dr. Peters attempted to testify that PATH should have required Elijah to wear a mask, consistent with the Center for Disease Control and Prevention (CDC) guidelines as of March 15, 2020, because of his medical history and "some common[-]sense evidence." The court precluded Dr. Peters' testimony on this issue over defense counsel's objections because it concluded he could not "give . . . an opinion as to what PATH the employer should or shouldn't have done, because he's not an expert in that regard. He's only here to give testimony on epidemiology." Dr. Peters testified, however, that PATH was "adhering to the guidelines that were issued by the CDC" in March 2020 and acknowledged the guidelines were the "prevailing public health authority in the United States." On October 17, 2023, the court declared a mistrial due to a family emergency on the part of plaintiff's counsel.

Prior to commencement of the second trial, defendant moved for summary judgment again on three limited bases: (1) plaintiff did not have a medical or workplace safety expert and thus could not establish the standard of care to

which defendant was required to adhere; (2) plaintiff could not establish medical causation; and (3) Dr. Peters' opinion was an inadmissible net opinion. After considering the parties' written submissions and oral arguments, on February 16, 2024, the court granted defendant summary judgment, explained its decision in an oral opinion, and entered a conforming order on February 20, 2024.

First, the court found plaintiff was required to present expert testimony to establish the applicable standard of care. Relying on Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1961), the court explained the issue was "so esoteric that jurors of common judgment and experience cannot substitute their own individual judgment as to whether the conduct of the PATH employer in this case . . . was or was not negligent." The court noted Dr. Peters "admitted under oath that [PATH] followed all the CDC guidelines in place at the time and under repeated questioning, could not point to any state or federal guidelines . . . that [PATH] violated in connection with their" COVID-19 policies.

The court recognized, however, "the simple fact that [PATH] complied with CDC guidelines [was] not dispositive." The court explained plaintiff did not retain or present at trial an expert in the fields of workplace safety, industrial safety, or industrial hygiene, and because the court "barred Dr. Peters from giving his personal opinion as to what the standard [of care] is, there will be and

9

has been nothing else in this case from which a rational juror [could] determine what the standard of care was that was applicable to [PATH] in 2020."

Second, the court determined plaintiff failed to establish medical causation with competent evidence. On this point, the court reiterated its earlier conclusion Elijah's death certificate was inadmissible hearsay because it "just blankly and baldly stated that [Elijah's] death was caused by or related to COVID[-19] . . . [and t]he pathologist was not available to . . . testify at the time of trial and was never deposed before trial."

With respect to Dr. Peters' conclusion Elijah contracted COVID-19 from Martinez, the court found that too to be an inadmissible net opinion because his "scientific methodology was so speculative in light of [Elijah's] exposures to so many other potential reasons to get COVID[-19]." The court explained:

> Dr. Peters admitted that this individual who admittedly was so [g]ung ho about masks, would get on trains, would go out before the alleged incident in question, was exposed to people on the PATH going between stops, going to work, coming home, and[] yet, [Dr. Peters] concluded that [Elijah] must have contracted COVID[-19] from this one instance when he was in the locker room with . . . Martinez.

Finally, the court concluded the sole proximate cause of Elijah's death was his decision to hug Martinez without wearing a mask. The court noted that Elijah's family consistently testified he was well-aware of the threat posed by

COVID-19, and "that he was so concerned about catching [COVID-19], that [Elijah's family] couldn't even leave the house without a mask, that he would bring home masks for them . . . , [and] that he would insist that they wear them." The court accordingly concluded Elijah's "failure to wear it in the locker room and hugging a guy and kissing [Martinez] without a mask was the sole and proximate cause of the accident."

## II.

Before us, plaintiff raises three primary arguments. First, she maintains "[t]he question of [medical] causation is presumptively a question of fact for a jury, and the facts and opinions of plaintiff's expert are sufficient for a jury to infer a reasonable conclusion, not mere speculation." Plaintiff argues the court inappropriately concluded that Dr. Peters' opinion Elijah contracted COVID-19 from Martinez was an inadmissible net opinion. She contends Dr. Peters' conclusion is not a net opinion because he "reviewed all the available records regarding [Elijah's] conduct and potential exposures"; took into account "the timing of the known exposure, the onset of symptoms[,] and the efforts to preclude any other exposures"; and "considered the environment at the time, the epidemiology of COVID-19[,] and the absence of evidence of exposure to the virus from other sources."

11

Additionally, plaintiff argues she "produced evidence of . . . medical causation at the abandoned trial and presumably could have done so at a retrial." Plaintiff notes at the mistrial she introduced evidence that Elijah died from heart failure due to COVID-19. She further contends although her counsel could not secure the testimony of the treating physician, pathologist, or other medical professional who otherwise authored the death certificate, "with a new trial scheduled and time to anticipate and to resolve the issue, that testimony was available to plaintiff." Plaintiff argues the court's decision was contrary to Rule 4:46-2 and ignored "[t]he reasonable inference, particularly given the efforts made by plaintiff's counsel to subpoena the treating physician, was that evidence of medical causation would be provided at the retrial."

Second, she contends in dismissing her case, the court "made numerous determinations of fact that were disputed on the record presented." Plaintiff argues the court erred by "treat[ing] the CDC guidelines as the standard of care and ruled that absent laws, regulations, government directives[,] or expert testimony based on government enactments, compliance with the CDC guidelines at the time was a basis to deny the jury its duty to determine PATH's negligence." Although plaintiff acknowledges the CDC guidelines "are relevant to the jury's factual determination of whether PATH acted reasonably under the

A-2335-23

totality of the circumstances," she maintains the ultimate decision as to the applicable standard of care was a factual issue for the jury.

She further contends under the facts presented there was no "need for expert testimony that taking away personal protective equipment (PPE) and ordering that PPE not be worn while around passengers may cause employees to be exposed to illnesses and to become sick."  With respect to the court's conclusion that the unique circumstances surrounding the early days of the COVID-19 pandemic required expert testimony to establish the requisite standard of care, plaintiff contends "[a]ccepting for the sake of argument that the pandemic created some esoteric standard of care, no one would be qualified to testify to the proper standard because it was unprecedented.  Put another way, no 'expert' would be any better able to determine what precautions" PATH should have taken.  Before us, plaintiff does not contend Dr. Peters' testimony is sufficient expert testimony on the issue of the standard of care nor does she specifically challenge the court's exercise of discretion to exclude any of Dr. Peters' testimony regarding the standard of care.

Finally, she maintains the court erred in concluding that Elijah's failure to wear a mask when he hugged Martinez in the locker room was the sole proximate cause of his death.  She argues the court's "determination exceeded the proper

13

role of the court generally and specifically on summary judgment and in actions under the FELA."  Relying on Pehowic v. Erie Lackawanna R.R. Co., 430 F.2d 697, 699-700 (3d Cir. 1970), plaintiff maintains that in FELA cases, "'a trial court is justified in withdrawing proximate cause issues from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee.'"  On the current record, plaintiff argues a jury could rationally conclude that "the evidence justifies with reason the conclusion that PATH's negligence played any part, even the slightest, in causing plaintiff's damages."

### III.

We first address the standards of review that guide our analysis, followed by the applicable substantive legal principles.  We review the disposition of a summary judgment motion de novo, applying the same standard used by the motion judge.  Townsend v. Pierre, 221 N.J. 36, 59 (2015).  Like the motion judge, we view "'the competent evidential materials presented . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve the alleged disputed issue in

14

favor of the non-moving party.'" Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill, 142 N.J. at 540); see also R. 4:46-2(c).

A motion for summary judgment will not be defeated by bare conclusions lacking factual support, Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011), self-serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 414 (App. Div. 2013), or disputed facts "of an insubstantial nature," Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2025). If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" courts will "not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

We apply an abuse of discretion standard in review of a trial court's decision to admit or exclude expert testimony. In re Accutane Litig., 234 N.J. 340, 348 (2018). Under this standard, a trial court's ruling will be reversed "only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

As noted, plaintiff brought this action under FELA, alleging defendant negligently failed to provide a reasonably safe workplace and its alleged negligence resulted in Elijah's death. FELA provides, in pertinent part, that

"[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. Thus, in a FELA case, plaintiff must produce evidence, either direct or circumstantial, that justifies or supports an inference of employer negligence. Stevens v. N.J. Transit Rail Operations, 356 N.J. Super. 311, 318 (App. Div. 2003) (citing Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 508 (1957)).

Plaintiff's burden is satisfied by showing that defendant's negligence "played any part, even the slightest[,] in producing the injury for which damages are sought." Ibid. (alterations in original) (citation omitted). "'[A] trial court is justified in withdrawing . . . issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee.'" Hines v. Consol. Rail Corp., 926 F.2d 262, 268 (3d Cir. 1991) (alterations in original) (quoting Pehowic, 430 F.2d at 699-700). With that said, "FELA is not a strict liability or workers' compensation statute; it is a negligence statute with an explicitly-stated relaxed standard of causation." Monheim v.

16

Union R.R. Co., 996 F. Supp. 2d 354, 361 (W.D. Pa. 2014) (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542-43 (1994)).

Although the FELA standard is generally more relaxed than the common law negligence standard, FELA plaintiffs remain obligated to establish the "traditional common law elements of negligence: duty, breach, foreseeability, and causation." Stevens, 356 N.J. Super. at 319 (citing Aparicio v. Norfolk and W. R.R. Co., 84 F.3d 803, 810 (6th Cir. 1996)). And while FELA requires every employer to exercise reasonable care to provide its employees with a safe work environment, reasonable foreseeability is a prerequisite to any claim. Hines, 926 F.2d at 268. The employer's responsibility is measured by "what a reasonably prudent person would anticipate as resulting from a particular condition." Gallick v. Balt. & Ohio R.R. Co., 372 U.S. 108, 118 (1963).

IV.

Based upon our de novo review of the record and the aforementioned legal principles, we are convinced the court correctly granted PATH summary judgment. As a preliminary matter, we are unpersuaded with plaintiff's argument that the court misapplied the summary judgment standard. Here, the court addressed defendant's application based upon the record made available to it by the parties. The court did not, as plaintiff contends, "assume that the

evidence and rulings on retrial would be the same as the first trial." Rather, the court based its decision upon the competent evidence presented and relied upon as set by the parties, including their references to relevant trial testimony, and the motion record in support of and in opposition to summary judgment.

We also agree with the court that Dr. Peters' opinion that Elijah contracted COVID-19 from Martinez was an inadmissible net opinion. See Quail, 455 N.J. Super. at 132. As the Quail court explained, "the doctrine barring the admission at trial of net opinions is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 132 (alterations in original) (quoting Townsend, 221 N.J. at 53-54). The court continues "[t]he net opinion principle mandates that experts 'give the why and wherefore' supporting their opinions, 'rather than . . . mere conclusion[s].'" Ibid. (all but first alteration in original) (quoting Townsend, 221 N.J. at 54).

In Quail, the decedent died after injuring her leg in a supermarket. Id. at 121. Interpreting the State Medical Examiners Act, N.J.S.A. 52:17B-92, the court upheld the trial court's exclusion of the decedent's bare death certificate as inadmissible hearsay "under N.J.R.E. 808, the net opinion doctrine, and pertinent case law." Id. at 121-22.

An expert opinion is a net opinion if it is "circular[]" or contains "bare conclusions, unsupported by factual evidence." Buckelew v. Grossbard, 87 N.J. 512, 524 (1981) (internal quotation marks omitted).  The "[f]ailure to provide such a causal connection" between the injury and the alleged error can also render an expert's opinion a net opinion.  Eckert v. Rumsey Park Assocs., 294 N.J. Super. 46, 51 (App. Div. 1996) (citing Buckelew, 87 N.J. at 524).  At its core, "[t]he net opinion Rule is a 'prohibition against speculative testimony.'" Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017) (quoting Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013)).

Although he concluded Martinez had COVID-19, Dr. Peters equivocated and conceded he could not "say with any certainty" that Elijah contracted COVID-19 from hugging Martinez.  As noted, Martinez never received a differential diagnosis he was positive for COVID-19, never received the results of his COVID-19 test from March, and no one in his household tested positive or had symptoms.  We also observe, as a smoker, Martinez stated it was normal for him to have a seasonal cough and allergies.

While Martinez's blood test in August 2020 showed he had antibodies, Dr. Peters' opinion does not foreclose that Martinez's antibodies stemmed from a different potential exposure in one of the months between March and August.

19

Dr. Peters acknowledged "you can't have any high degree of certainty . . . which [contact] is the smoking gun." Simply put, his conclusory analysis was insufficient to support his causation opinion and instead would leave the jury to rely on "'speculative testimony.'" Ehrlich, 451 N.J. at 134 (quoting Harte, 433 N.J. Super. at 465).

We are also convinced the court correctly determined Dr. Peters' opinion on Elijah's cause of death was a net opinion and discern no abuse of the court's discretion in excluding the death certificate under N.J.R.E. 808.

In reaching this conclusion, we are mindful that "FELA's language on causation . . . 'is as broad as could be framed.'" CSX Transp., Inc. v. McBride, 564 U.S. 685, 691 (2011) (quoting Urie v. Thompson, 337 U.S. 163, 181 (1949)). That broad language, however, does not eliminate a plaintiff's obligation to prove causation or remove from a trial judge his or her role as "the gatekeeper of expert witness testimony." In re Accutane Litig., 234 N.J. at 388; see also Stevens, 356 N.J. Super. at 319.

Federal courts have long opined on the relevance of expert testimony to prove medical causation in FELA cases. "Expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury unless the connection is a kind that would be obvious to laymen,

such as a broken leg from being struck by an automobile." Moody v. Maine Cent. R.R. Co., 823 F.2d 693, 695 (1st Cir. 1987) (citations omitted). "[W]hen there is no obvious origin to an injury and it has 'multiple potential etiologies, expert testimony is necessary to establish causation.'" Myers v. Illinois Central R.R. Co., 629 F.3d 639, 643 (7th Cir. 2010) (quoting Wills v. Amerada Hess Corp., 379 F.3d 32, 46-47 (2d Cir. 2004)).

At trial, Dr. Peters asserted Elijah's cause of death was COVID-19 and based that opinion from the death certificate. As noted, N.J.R.E. 808 imposes "restrictions upon the admission at trial of complex disputed expert opinions that appear within an otherwise-admissible hearsay record." Quail, 455 N.J. Super. at 131 (citing Supreme Court Committee Comment to N.J.R.E. 808 (1991); Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 808 (2018)). Applying N.J.R.E. 808, the Quail court held "the [c]ertificate reciting a cause of death is the very sort of disputed opinion on a complex subject that should not be admitted without the opportunity to cross-examine the author." Id. at 132. The result in this instance is no different, and the trial court did not err in precluding the death certificate.

Dr. Peters' testimony omits the "'whys and wherefores' supporting the death certificate's opinions about decedent's cause of death." Quail, 455 N.J.

21

Super. at 132. Indeed, Dr. Peters' trial testimony merely narrated the findings on the death certificate and failed to sufficiently address the adverse evidence including Elijah's seemingly three negative COVID-19 tests at the hospital shortly before his death and his influenza A diagnosis upon admission.

Finally, we regard plaintiff's argument the court erred in granting summary judgment because she could have subpoenaed and called Elijah's treating physicians and the author of death certificate at any retrial as unpersuasive. As noted, a party opposing summary judgment must present competent proofs in the record at the time of opposition showing a genuine issue of material fact, not just suggest possible future inquiries. See R. 4:46-2(c).

V.

Finally, we are also unconvinced with plaintiff's argument the court erred by "treat[ing] the CDC guidelines as the standard of care and rul[ing] that absent laws, regulations, government directives[,] or expert testimony based on government enactments, compliance with the CDC guidelines at the time was a basis to deny the jury its duty to determine PATH's negligence." First, contrary to plaintiff's assertion that the court "treated the CDC guidelines as the standard of care," it explicitly stated defendant's compliance "with the CDC [guidelines was] not dispositive on the standard of care question."

Second, the court correctly found plaintiff was required to present expert testimony to establish the standard of care because we are convinced under the circumstances the issue was "'so esoteric that jurors of common judgment and experience [could not] form a valid judgment as to whether the conduct of . . . [defendant] was reasonable.'" Davis v. Brickman Landscaping Ltd., 219 N.J. 395, 407 (2014) (quoting Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (1982)).

"In most negligence cases, the plaintiff is not required to establish the applicable standard of care." Id. at 406 (citing Sanzari, 34 N.J. at 134). "Such cases involve facts about which 'a layperson's common knowledge is sufficient to permit a jury to find that the duty of care has been breached without the aid of an expert's opinion.'" Id. at 407 (quoting Giantonnio v. Taccard, 291 N.J. Super. 31, 43 (App. Div. 1996)). That is because "some hazards are relatively commonplace and ordinary and do not require the explanation of experts in order for their danger to be understood by average persons." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 450 (1993) (stating an expert is not required to establish a dangerous condition of camouflaged step).

In contrast, "[i]n some cases, [] the 'jury is not competent to supply the standard by which to measure the defendant's conduct,' and the plaintiff must instead 'establish the requisite standard of care and [the defendant's] deviation

from that standard' by 'present[ing] reliable expert testimony on the subject.'" Davis, 219 N.J. at 407 (citations omitted) (first quoting Sanzari, 34 N.J. at 134-35; and then quoting Giantonnio, 291 N.J. at 42); see also N.J.R.E. 702 (permitting expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). In such cases where "the factfinder would not be expected to have sufficient knowledge or experience," expert testimony is needed because the jury "would have to speculate" regarding the standard of care. Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing Kelly v. Berlin, 300 N.J. Super. 256, 268 (App. Div. 1997)). These principles apply equally in FELA cases. Stevens, 356 N.J. Super. at 321 (expert not required to demonstrate machine unsafe when plaintiff presented ample evidence that physical "contortions" required for use were clear to any lay observer); Schulenberg v. BNSF Ry. Co., 911 F.3d 1276, 1289-90 (10th Cir. 2018) (expert required to establish that railroad track did not meet federal standards for deviation under load).

We agree with the court a jury could "not be expected to have sufficient knowledge or experience" to determine what standard of care defendant should be judged by regarding its masking policies in the earliest days of the COVID-

19 pandemic. <u>Torres</u>, 342 N.J. Super. at 430 (citing <u>Kelly</u>, 300 N.J. Super. at 268). In March 2020, it cannot be reasonably disputed that the COVID-19 pandemic was in its relative infancy and medical professionals, much less lay people, were scrambling to understand the disease and create guidelines for businesses and the public at that stage of the pandemic. The appropriate standard of care regarding PPE use during this critical period is not "relatively commonplace and ordinary." <u>Hopkins</u>, 132 N.J. at 450. Without expert testimony, we agree with the court that the jury "would have [been left] to speculate" regarding the standards public employers like PATH were expected to hew, and whether those entities' actions or inactions violated those standards. <u>Torres</u>, 342 N.J. Super. at 430.

Considering our conclusion plaintiff failed to support its claim with the necessary expert testimony as to medical causation and standard of care, we need not, and do not, address plaintiff's <u>Pehowic</u>-based argument that the court erred in concluding Elijah's failure to wear a mask was the sole proximate cause of his death. <u>See</u> <u>Pehowic</u>, 430 F.2d at 699-700. As to any of the remaining contentions to which we do not discuss nor refer, we have done so after reaching the conclusion they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

25

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2335-23